# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:  Bard IVC Filters Products Liability Litigation | No. MDL 15-02641 |
| | **PRETRIAL ORDER NO. 3** |
| THIS ORDER RELATES TO ALL ACTIONS: | (Non-Waiver Order Pursuant to Rule 502(d) of the Federal Rules of Evidence) |

WHEREAS:

(A)    The parties seek to resolve disputes related to entries on past and future privilege logs of Defendants C.R. Bard, Inc. and Bard Peripheral Vascular, Inc. (collectively "Bard") withheld pursuant to the attorney-client privilege, the work-product doctrine, and/or other privileges;

(B)    In furtherance of this goal, Plaintiffs and Bard have entered into negotiations, and counsel for the parties are meeting and conferring regularly regarding Bard's privilege logs;

(C)    As part of the meet and confer process, Bard is reviewing certain privilege log entries identified by Plaintiffs.  Bard may provide the Plaintiffs with a small number of these identified items for inspection from time to time to further the meet and confer discussions; and

(D)    As part of the meet and confer process, Bard may choose to withdraw certain claims of attorney-client privilege, the work-product doctrine, and/or other privilege(s), and produce the previously withheld items.

1    Therefore, the parties have agreed, and

2    **IT IS ORDERED**:

3    1.    The parties' discussions, Bard's disclosure or production of the contents or

4    copies of the documents or items on its past and/or future privilege logs as part of the

5    meet and confer process shall not, pursuant to Federal Rule of Evidence 502(d),

6    constitute any waiver of any privilege and/or work-product protection in this MDL, or in

7    any other federal or state proceeding.

8    2.    This Order does not alter or amend Section VII, Paragraph 31 of the

9    Stipulated Protective Order (Doc. 269), entitled "Inadvertent Production."

10   Dated this 1st day of December, 2015.

11

12

13

14   _____

15               David G. Campbell
                 United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28

- 2 -

**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE:  BARD IVC FILTERS PRODUCTS LIABILITY LITIGATION | MDL No. 2641 |
| This Order Relates to:  All Actions | |

Defendants C. R. Bard, Inc. and Bard Peripheral Vascular Services, Inc. ("Bard") seek a protective order to prevent Plaintiffs from using the December 15, 2004 report of Dr. John Lehmann.  Doc. 306.  The issues are fully briefed (Docs. 379, 412), and the Court heard oral argument on January 29, 2016 (Doc. 507).  The Court concludes that no additional discovery or evidentiary hearing is necessary to resolve this issue.  For the following reasons, the Court will grant Bard's motion.

## I.     Background.

The facts in this section are taken largely from testimony given in an evidentiary hearing in *Alexander v. Bard*, No. 3:12-CV-05187-O-BK (N.D. Tex. June 11, 2014).  *See* Doc. 319-2 at 7-137.  The Court will explain later in this order why it finds the testimony credible.

Dr. Lehmann is a consultant who has provided different services to Bard at different times.  Beginning in late 2003, Dr. Lehmann was retained to serve as Bard's acting director of medical services.  Doc. 319-2 at 93, 107-08.  Dr. Lehmann served in this capacity until Bard hired Dr. David Ciavarella to replace him in May 2004.  Docs. 319-2 at 93-94; 412-1 at 6.  As acting medical director, Dr. Lehmann reviewed and

approved documents, prepared health hazard evaluations ("HHE") and remedial action plans ("RAP"), responded to queries from various medical divisions, and assisted in Bard's hiring of Dr. Ciavarella. Doc. 319-2 at 93-96. In this role, Dr. Lehmann drafted two HHEs that are particularly relevant to this dispute: the March 10, 2004 HHE (Doc. 445-1 at 4-15), and the April 27, 2004 HHE (Doc. 414 at 3-15), both of which address Recovery Filter migration events. The Law Department occasionally asked Dr. Lehmann in his capacity as acting medical director to review medical records for particular cases. Doc. 319-2 at 30. Once Bard hired Dr. Ciavarella, Dr. Lehmann did not work on anything related to the Recovery Filter until the Law Department retained his services in November 2004. *Id.* at 102.

In early 2004, Bard began receiving notices of adverse events associated with the Recovery Filter. For example, in February 2004 Bard learned of a patient death related to the migration of a Recovery Filter. Docs. 319-2 at 40-41; 445-1 at 5. In April, Bard learned of a second migration death associated with the filter. Doc. 414 at 4. Bard's assistant general counsel, Donna Passero, began to receive letters demanding compensation from lawyers and patients who had experienced such adverse events. Doc. 319-2 at 25. In June, Passero responded to a letter that raised possible product liability and medical malpractice claims. Doc. 319-2 at 28-29. In July, Bard notified its insurance carrier of potential claims involving the Recovery Filter. Docs. 319 at 27-29; 319-2 at 29, 91. These potential claims led the Law Department to retain Dr. Lehmann to conduct a broad risk assessment of the Recovery Filter. Doc. 319-2 at 38-39.

The Law Department retained Dr. Lehmann as a consultant in November 2004. *Id.* at 2-3, ¶ 6, 93. On November 15, 2004, Dr. Lehmann and Judith Reinsdorf, Bard's General Counsel, executed a consulting agreement. Docs. 319-2 at 3, ¶ 8, 36, 94; 335 at 3-9. The agreement said that Dr. Lehmann's services would be provided in "anticipation of litigation." Doc. 335 at 3, ¶ 1. Dr. Lehmann's work for the Law Department was unlike the work he had performed as acting medical director; he was retained to provide a broad assessment of the risks associated with Bard's Recovery Filter to assist the Law

Department in advising Bard on the extent of its legal exposure.  Doc. 319-2 at 31-32, 96. Dr. Lehmann reviewed relevant medical literature, examined the Recovery Filter complaints Bard had received up to that point, analyzed data from the FDA's adverse event reporting database (known as "MAUDE"), reviewed bench testing data for the Recovery Filter and its competitors, and prepared a written report of his findings. Docs. 319-2 at 97-98; 335 at 9.  During this investigation, and at Passero's direction, Dr. Lehmann communicated with "a small and limited number of Bard employees for the purpose of obtaining and providing information in order to" complete his work. Doc. 319-2 at 3, ¶ 10.

On December 15, 2004, Dr. Lehmann submitted his report ("Report") to Passero. Docs. 319-2 at 3, ¶ 11, 98, 104-05; 335 at 3, ¶ 2, 11.  The Report contained a header on every page stating that it was "[p]rivileged and confidential," "[a]ttorney work product," and "[p]ursuant to contract."  *See, e.g.*, Doc. 335 at 13.  Passero distributed the Report to five Bard employees, including Bard's general counsel.  Doc. 319-2 at 3, ¶ 11, 36, 83. Eventually, the Report was distributed to approximately 12 Bard employees.[1]  *See id.* at 140-41, ¶¶ 3-4.  Passero testified that she distributed the Report internally because it recommended that Bard immediately and urgently address several issues.  *Id.* at 37; *see also id.* at 3, ¶ 11.  Passero instructed the recipients "that the report and associated materials were confidential and that any further distribution of the report should be limited to only those employees or consultants who need the report to perform their proper job functions."  *Id.* at 3, ¶ 11, 83.  There is no evidence that the Report was distributed to anyone other than Bard employees.

## II.    Legal Standard.

"A party or any person from whom discovery is sought may move for a protective

---

[1] The record does not clearly establish how the remaining Bard employees received the Report.  Presumably, the individuals to whom Passero gave the Report passed it along to others.  *See* Doc. 319-2 at 3, ¶ 11.  The record is similarly unclear as to the identities of the 12 Bard employees who received the Report, although Bard's briefing suggests that it is the 12 individuals named in Robert Carr's February 3, 2014 affidavit.  *See* Doc. 306 at 9, 16; *see also* Doc. 319-2 at 140-41, ¶¶ 3-4.

order in the court where the action is pending."  Fed. R. Civ. P. 26(c)(1).  Rule 26(c) authorizes a district court to grant a protective order where "good cause" is shown.  *See San Jose Mercury News, Inc. v. U.S. Dist. Ct.*, 187 F.3d 1096, 1103 (9th Cir. 1999).  "[T]he party seeking protection bears the burden of showing specific prejudice or harm will result if no protective order is granted."  *Phillips v. G.M. Corp.*, 307 F.3d 1206, 1210-11 (9th Cir. 2002) (quotation marks and citations omitted).

### III.   Analysis.

Bard argues that (1) the Report is protected from disclosure by the work product doctrine; (2) Plaintiffs have not shown a substantial need for the Report, or that they will experience an undue hardship in obtaining substantially equivalent information; and (3) Bard did not waive the Report's work-product protection.  The Court will explain why it agrees with these three assertions.

### A.   The Report is protected work product.

"Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, *consultant*, surety, indemnitor, insurer, or *agent*)."  Fed. R. Civ. P. 26(b)(3)(A) (emphasis added).  Courts in the Ninth Circuit use the "because of" test to determine whether dual purpose documents were prepared in anticipation of litigation:

> In circumstances where a document serves a dual purpose, that is, where it was not prepared exclusively for litigation, then the "because of" test is used.  Dual purpose documents are deemed prepared because of litigation if in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained because of the prospect of litigation.  In applying the "because of" standard, courts must consider the totality of the circumstances and determine whether the document was created because of anticipated litigation, and would not have been created in substantially similar form but for the prospect of litigation.

*United States v. Richey*, 632 F.3d 559, 567-68 (9th Cir. 2011) (quotation marks and citations omitted).

Before the start of this MDL, Passero and Lehmann testified in an evidentiary hearing in the *Alexander* case cited above. *See* Doc. 319-2 at 7-137. Attorneys who are part of the Plaintiffs' Steering Committee in this MDL participated in the hearing and cross-examined Passero and Lehmann. *Id.* at 9. Bard relies on affidavits, documentary evidence, and testimony from the *Alexander* hearing to show that the Report was created because of anticipated litigation. *See* Doc. 306 at 9-13.

Documents confirm that, beginning in early 2004, Bard and its legal counsel began receiving notices that the Recovery Filter was associated with adverse events, including several deaths. *See* Docs. 319 at 14-25 (letters and emails involving lawyers and patients who had experienced adverse events associated with the Recovery Filter); *id.* at 31-80 (Bard complaint files for patients who had experienced adverse events associated with the Recovery Filter); 319-1 at 1-230 (same). Bard received several threats of litigation. Doc. 319 at 14-16 (February 3, 2004); *id.* at 20-21 (June 7, 2004); *id.* at 23 (June 15, 2004). In July 2004, Bard notified its insurance carrier of potential claims relating to the Recovery Filter. Docs. 319 at 27-29; 319-2 at 29, 91. Plaintiffs do not dispute this documentation.

Ms. Passero stated in an affidavit and during her testimony in *Alexander* that these events caused the Law Department to retain Dr. Lehmann as a consultant to conduct a broad risk assessment. Doc. 319-2 at 2 (¶¶ 6-7), 32. Dr. Lehmann confirmed this fact in his testimony. *Id.* at 93-95.

The consulting agreement was executed by Dr. Lehmann and Bard's general counsel, and provided that Dr. Lehmann would report directly to, and take directions from, attorney Passero and the Law Department. Docs. 319-2 at 3, ¶ 9, 36, 94; 335 at 3-9. The agreement stated that Dr. Lehmann's services were being retained in "anticipation of litigation." Doc. 335 at 3, ¶ 1. Dr. Lehmann's Report was submitted directly to Passero. Docs. 319-2 at 3, ¶ 11, 98, 104-05; 335 at 3, ¶ 2, 11. The Report contained a header stating that it was "[p]rivileged and confidential," "[a]ttorney work product," and "[p]ursuant to contract." *See, e.g.*, Doc. 335 at 13.

- 5 -

1       Plaintiffs argue that the Report was prepared in the ordinary course of business.

2   *See* Doc. 379 at 12-19.  They assert that Bard's regular business includes remedial actions

3   and "significant obligations to investigate and to report product failures, including

4   conducting comparisons to competitor products."  *Id.* at 13.  Plaintiffs point to Bard's

5   Regulatory Affairs Manual (Doc. 445-2 at 11-26, 35-53) and various statutes and

6   administrative regulations as proof of these obligations.  *See* Doc. 379 at 5-6, 13-14.

7   Plaintiffs contend that Bard's Regulatory Affairs Manual establishes that Dr. Lehmann

8   was a member of Bard's Product Assessment Team when he was serving as acting

9   medical director.  *Id.* at 13-14.  Even if this is true, Plaintiffs fail to link this fact to Dr.

10  Lehmann's work in preparing the Report – work that was conducted months later and in

11  his capacity as a consultant for the Law Department.

12      It is true that the statutes and regulations impose on Bard certain obligations: to

13  maintain complaint and adverse event files (*see* 21 C.F.R. §§ 820.198, 803.1), investigate

14  and report to the FDA certain product failures (*see* 21 C.F.R. § 820.198), undertake

15  certain duties with respect to misbranded or adulterated devices (*see* 21 U.S.C. §§ 321,

16  331, 351, 352, 360), and perform quality audits (*see* 21 C.F.R. § 820.22).  But these laws

17  do not impose an obligation to conduct the extensive and comparative statistical and

18  bench testing data analyses undertaken by Dr. Lehmann and memorialized in the Report.

19  Both Passero and Dr. Lehmann testified that the Report was an unusual undertaking,

20  prepared in anticipation of litigation and unrelated to Bard's regulatory obligations.  *See*

21  Doc. 319-2 at 33-34, 38, 93-98, 108-10, 113-17.  Even considering and crediting

22  Plaintiffs' evidence, the Court finds these assertions largely unrebutted.  The Report was

23  a more extensive and detailed analysis than Bard normally created.  The evidence does

24  not support Plaintiffs' assertion that the Report was prepared in the ordinary course of

25  Bard's business.  It supports a finding that the Report "would not have been created in

26  substantially similar form but for the prospect of litigation," *Richey*, 632 F.3d at 568,

27  which satisfies the Ninth Circuit's work product test.[2]

28

    [2] At oral argument, the Court asked Plaintiffs to cite the specific statute or

1   Plaintiffs also argue that the Report was used for Bard's business purposes, and

2 that there is no evidence it was used for litigation purposes. Doc. 379 at 14-15. Plaintiffs

3 identify three internal Bard documents that contain information from the Report: the

4 December 12, 2004 HHE, the January 4, 2005 RAP, and a December 9, 2004 draft of the

5 January RAP. *Id.* at 14. A review of these documents confirms that the Report was used

6 in creating them. Bard also admitted this fact during oral argument and in its reply brief.

7 Doc. 412 at 7. But use of the Report to create internal HHEs and RAPs does not deprive

8 the Report of work product protection. To the contrary, the "because of" test is directed

9 at documents that serve both litigation and business purposes. *See Richey*, 632 F.3d at

10 567-68 ("In circumstances where a document serves a dual purpose, that is, where it was

11 not prepared exclusively for litigation, then the 'because of' test is used."). The Court

12 must determine whether "the document was created because of anticipated litigation, and

13 would not have been created in substantially similar form but for the prospect of

14 litigation." *Id.* at 568. As discussed in this order, the evidence supports such a finding.

15   Plaintiffs also cite no authority for their argument that Bard must show the Report

16 was actually used in litigation. The test is whether the Report was "*prepared* in

---

17
18 regulation that they claim required Bard to produce the Report. Plaintiffs cited 21 C.F.R. § 820.22. The Court has closely reviewed this regulation, as well as related regulations, and concludes that § 820.22 did not require Bard to create the Report. First, § 820.22

19 focuses on quality systems. *Id.* ("Each manufacturer shall *establish procedures for*

20 *quality audits* and conduct such audits to assure that the *quality system is in compliance* with the established quality system requirements and to *determine the effectiveness of the*

21 *quality system.*") (emphasis added). "Quality system" is defined as "the organizational structure, responsibilities, procedures, processes, and resources for implementing quality

22 management." *Id.* § 820.3(v). This suggests that the quality audits mentioned in § 820.22 are focused on ensuring that manufacturers have proper quality assurance procedures in

23 place and are, in fact, following those procedures. Second, the FDA's comments in the preamble to the regulation confirm that this is the purpose of § 820.22. *See* 61 Fed. Reg.

24 52602, 52614 (Oct. 7, 1996) ("Quality audit[s] are for an internal audit and review of the quality system to verify compliance with the quality system regulation. The review and

25 evaluations under § 820.22 are very focused. During the internal quality audit, the manufacturer should review all procedures to ensure adequacy and compliance with the

26 regulation, and determine whether the procedures are being effectively implemented at all times."). Third, the regulatory structure indicates that § 820.22 is focused on procedures

27 and processes, rather than on a particular product's safety. The regulation is located in Subpart B "Quality System Requirements," and not in other subparts that more directly

28 address the subject matter of the Report, such as Subpart G "Production and Process Controls," Subpart I "Nonconforming Product," or Subpart J "Corrective and Preventative Action."

- 7 -

anticipation of litigation," not whether it was used in litigation. Fed. R. Civ. P. 26(b)(3) (emphasis added). Requiring parties to show that a document was used in litigation would likely invade both the work product protection and the attorney-client privilege.

Plaintiffs similarly argue that the Report does not mention litigation, legal analysis, or litigation strategy. But work product protection is not limited to legal analysis or litigation strategy – it includes "documents and tangible things that are prepared in anticipation of litigation . . . for another party or its representative," including by its "consultant" or "agent." *Id.*; *see Richey*, 632 F.3d at 567 ("The work-product doctrine covers documents or the compilation of materials prepared by agents of the attorney in preparation for litigation."). Thus, a purely technical analysis of a Bard filter prepared by one of Plaintiffs' consulting experts in anticipation of litigation would be work product regardless of whether it included litigation strategy or legal analysis. Indeed, when work product must be disclosed under Rule 26 for substantial need, courts are directed to withhold "mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation," making clear that work product includes more than this kind of legal analysis. Fed. R. Civ. P. 26(b)(3)(B).

Plaintiffs contend that the Report is not work product because litigation was not "imminent." Doc. 379 at 16-17. But Plaintiffs cite no authority for the proposition that work product protection applies only when litigation is imminent. The test is whether litigation was reasonably anticipated, and the adverse events and litigation threats of 2004 clearly satisfied this requirement.

Plaintiffs also argue that Bard did not reasonably anticipate litigation when it retained Dr. Lehmann because Bard had not yet implemented a litigation hold on documents and electronically stored information. *Id.* at 16. But even if Bard failed to implement a timely litigation hold as Plaintiffs contend – an issue the Court does not decide at this time – that fact would not prove that litigation was not reasonably anticipated. Parties can fail to comply with preservation obligations in the face of reasonably anticipated litigation. Plaintiffs do not dispute that deaths and injuries from

the Recovery Filter had been reported in 2004, that Bard had received demands for compensation, or that Bard had put its insurance carrier on notice of possible claims. The totality of the circumstances clearly shows that litigation was reasonably anticipated.

Plaintiffs argue that the Report was prepared in the ordinary course of business because "Dr. Lehmann's work was well underway long before he was given a contract with the Law Department." Doc. 379 at 17. While there is no dispute that Dr. Lehmann worked as Bard's acting medical director in late 2003 and early 2004, Dr. Lehmann testified in the *Alexander* hearing that this role terminated on the hiring of Dr. Ciavarella in May 2004 and that, other than occasional communications with Dr. Ciavarella, he performed no work for Bard until November 2004. Doc. 319-2 at 93-98. Dr. Lehmann also testified that the work he performed as acting medical director was substantially different from the work done to produce the Report. *Id.* Plaintiffs present no direct evidence to contradict this testimony. Plaintiffs instead identify several documents as indirect evidence that Dr. Lehmann's work as acting medical director was related to his Law Department work that culminated in the Report: the March 10, 2004 HHE (Doc. 445-1 at 4-15); an April 15, 2004 email (Doc. 443-1 at 5-8); and the April 27, 2004 HHE (Doc. 414 at 3-15).

Dr. Lehmann's testimony directly addressed the differences between these HHEs and the Report. Dr. Lehmann testified that: HHEs were prepared pursuant to Bard's regulatory obligations, while the Report was not; the purpose of HHEs was to "guide potential market actions or corrections," while the purpose of the Report was to provide guidance on Bard's risk and overall exposure from adverse events associated with the Recovery Filter; HHEs considered a product's risks and benefits, while the Report considered only the Recovery Filter's risks; HHEs each focused on a single adverse event involving migration, while the Report dealt with all adverse events associated with the Recovery Filter; and the Report involved detailed statistical analysis personally performed by Dr. Lehmann, while HHEs did not. *See* Doc. 319-2 at 96-98. The Court's close review of the HHEs and the Report confirms these distinctions.

The four-page HHE dated March 10, 2004 was prepared by Dr. Lehmann after the February 2004 death of a patient due to the migration of a massive blood clot and a Recovery Filter to the patient's heart.[3]  Doc. 445-1 at 5.  The HHE focused on this single adverse event and discussed the placement of the filter, the patient's risk factors, the autopsy report, and other medical evidence.  *Id.* at 5-6.  The HHE included a short review of other Recovery Filter migration complaints.  *Id.* at 6.  The HHE then addressed the following subjects: human exposure to the problem, general consequences, population exposed to risk, mitigating or predisposing factors, nature and seriousness of the risk, likelihood of occurrence, likelihood of harm, whether the product is essential to health, whether there are available alternatives, whether the problem must be corrected surgically, whether the problem is expected and within an acceptable statistical range, whether the problem can be field corrected, whether the problem is obvious to the user, whether the product can continue to be used with proper warnings, and whether the device is used only by specially-trained health care professionals.  *See id.* at 6-8.  The HHE concluded that "[t]here have been 3 migrations of the Recovery VC Filter in which the device ended up in or near the heart, with one fatality, in an estimated 6,402 sales through March 2, 2004, for a rate of 0.05%."  *Id.*  This is the only statistical calculation in the HHE, and includes a warning that comparative assessments using data from "the MAUDE database do not yield reliable quantitative estimates."  *Id.*  With respect to whether the problem is expected and within an acceptable statistical range, the HHE stated that "[e]stimates based on MAUDE and sales data suggest that there is no significant difference in the rates of these complications between devices, including the Recovery" Filter.  *Id.* at 8.

The Report has a broader focus.  It contains statistical analyses relating to selected types of adverse events associated with the Recovery Filter and other filters on the market, including rates of reported filter fractures, caval perforation, filter movement, filter embolization, and filter embolization deaths.  Doc. 335 at 13.  Using MAUDE data,

---

[3] The April 27, 2004 HHE is similar to the March HHE in all relevant respects.

actual sales data for the Recovery Filter, and estimated sales data for other filters, the Report calculates and compares adverse event reporting rates for the Recovery Filter and seven other types of filters. *Id.* at 19-20. The Report then uses the reporting rates to calculate relative risks for each of the eight filters for different types of adverse events. *Id.* at 21-27. The Report also reviews Bard's bench testing data that was used to determine migration resistance for each of the eight filters, and compares the bench data to the frequency of adverse events reported in the MAUDE data base. *Id.* at 31-33. The Report concludes that "[t]his data and analysis provides two significant signals (MAUDE rates and bench test data) that further investigation of the Recovery VCF filter performance in relation to migration and fracture is urgently warranted." *Id.* at 16. This is a different focus than the HHEs. True, there are some similarities between the HHEs and the Report, but the documents clearly serve different purposes and their substantial differences corroborate Dr. Lehmann's testimony that the Report was a different undertaking than the work he did as acting medical director.

In the April 15, 2004 email relied on by Plaintiffs, Dr. Lehmann stated that "[c]omparison with other filters is problematic in many ways, and we should avoid / downplay this as much as possible." Doc. 443-1 at 5. Plaintiffs argue that this statement shows that Dr. Lehmann performed the same work as acting medical director that he did in preparing the Report. But the fact that Dr. Lehmann – or others within Bard – did some comparisons with other filters while he was acting as Bard's medical director does not prove that the detailed statistical analysis and evaluation of bench-testing results contained in the Report were done before his contract with the Law Department or for another reason. Nor have Plaintiffs cited any authority for the proposition that work product is not entitled to protection if it is similar in some way to work the person has done before. Rather, the test is whether the Report "would not have been created in substantially similar form but for the prospect of litigation." *Richey*, 632 F.3d at 568. After examining the HHEs and the April 2004 email, and comparing them with the Report, the Court finds that they do not undercut the testimony of Dr. Lehmann that the

1    Report was prepared at the behest of the Law Department and would not have been

2    created in substantially similar form otherwise.

3           Finally, Plaintiffs cite language from the December 2004 draft RAP which states

4    that Dr. Lehmann "was commissioned by *Corporate Senior Management* to provide an

5    independent study of the risk/benefit of the [Recovery Filter] in bariatric patients."

6    Doc. 379 at 9 (emphasis added by Plaintiffs). Plaintiffs argue that this proves Dr.

7    Lehmann was hired by the business, not by the legal department, to prepare the Report.

8    But Dr. Lehmann's consulting contract was signed by Judith Reinsdorf, Bard's Vice

9    President, General Counsel, and Secretary. Doc. 335 at 8. She clearly qualified as

10   "Corporate Senior Management," as stated in the draft RAP. She also was Bard's lead

11   in-house lawyer. The Court cannot conclude that the statement in the draft RAP is

12   somehow inconsistent with the fact that the Report was prepared at the request of the

13   Law Department and in anticipation of litigation.[4]

14          In summary, the Court finds that the clear threat of litigation in 2004, Dr.

15   Lehmann's retention by the Law Department in November of that year, the contract he

16   signed with Bard's general counsel, the scope of work be performed under the contract,

17   and the clear labeling of the Report as work product all support a finding that the Report

18   was prepared because of anticipated litigation. Dr. Lehmann testified that his work in

19   late 2003 and early 2004 as acting medical director was different than the work he did

20   under the contract, and the documents cited by Plaintiffs do not undercut that testimony.

21   To be sure, there are some general similarities between the HHEs and the Report, and the

22   Report was used for some business purposes, but these facts do not contradict the clear

23   evidence that the Report "would not have been created in substantially similar form but

24   for the prospect of litigation." *Richey*, 632 F.3d at 568. The Court finds no evidence to

25   support Plaintiffs' suggestion that the work product label for the Report was some kind of

26

27          [4] What is more, this language did not appear in the January 4, 2005 final version of
     the RAP. *See* Doc. 306-1 at 43-44 ("As part of the ongoing evaluation of [the Recovery
28   Filter], Bard requested an independent study of the risks and benefits of the [Recovery
     Filter], with an emphasis on its use in bariatric surgery and trauma patients.").

grand ruse, implemented to hide unfavorable information.  Based on the totality of the circumstances, the Court concludes that the Report was prepared "because of" anticipated litigation and is protected by the work-product doctrine.  Fed. R. Civ. P. 26(b)(3)(A); *Richey*, 632 F.3d at 567-68.

**B.      Plaintiffs have not shown substantial need or undue hardship.**

Work product protection is not absolute.  A protected but otherwise discoverable document may be obtained in discovery if "the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means."  Fed. R. Civ. P. 26(b)(3)(A).  The Advisory Committee has made clear that a "special showing" is required.  *See Bickler v. Senior Lifestyle Corp.*, 266 F.R.D. 379, 384 (D. Ariz. 2010) (citing Fed. R. Civ. P. 26(b)(3) advisory committee's note (1970)).

Bard argues that Plaintiffs have full access to all of the data analyzed in Dr. Lehmann's Report and that their experts can – and already have in some of the consolidated cases – perform the same analysis.  Plaintiffs do not disagree, but instead attempt to show their substantial need by arguing this:

> Yes, Plaintiffs can analyze the same data Dr. Lehmann did.  Plaintiffs in other cases have even hired experts to do the same work.  But Plaintiffs should not be required to present the evidence in this cumbersome fashion and incur the expense and delay associated with hiring an independent expert simply to show what Bard knew as of December 2004 and communicated to several high-ranking officials in its corporation.  The Report does all of that.  Why waste days of trial (in every MDL case remanded for trial) with the concomitant strain on judicial and party resources to employ, prepare, present, and depose experts, along with the inevitable *Daubert* hearing exercise, when all that same information is in one report provided to several Bard employees primarily used to comply with Bard's reporting requirements to the FDA?

Doc. 379 at 28.

The Court finds this argument wholly unpersuasive.  Plaintiffs essentially concede that they can create the substantial equivalent of the Report through their own experts, but argue – in this substantial and well-funded MDL proceeding – that they should not be

put to the time and expense of retaining their own experts.  If this were a sufficient "special showing" to overcome work product protection, *Bickler*, 266 F.R.D. at 384, the protection would be lost in every case where the opposing side would have to expend meaningful resources to obtain the substantial equivalent of the work product.  This is not the law.  *See, e.g.*, *Fletcher v. Union Pac. R.R. Co.*, 194 F.R.D. 666, 671 (S.D. Cal. 2000) (citing 8 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2025, at 374, n.15 (3d ed. 2015)) (finding "mere[] expense or inconvenience" insufficient to constitute undue hardship).

Plaintiffs asserted during oral argument that there is a fact they cannot prove through their own experts: that Bard *knew* of Dr. Lehmann's unfavorable conclusions.  But Plaintiffs' briefing on this issue suggestions otherwise: "Plaintiffs should not be required to . . . incur the expense and delay associated with hiring an independent expert simply to show what Bard *knew* as of December 2004."  Doc. 379 at 28 (emphasis added).  What is more, Plaintiffs' briefing includes many cites to evidence they claim shows that Bard knew about the problems arising from its filters, including a statement in which Dr. Lehmann, in his role as acting medical director, allegedly was urging Bard to downplay the problem.  *See* Doc. 443-1 at 5 ("Bottom line: good filter, severe case, bad outcome, deep regret.  This is the simple story we should repeat again and again.  Comparison with other filters is problematic in many ways, and we should avoid / downplay this as much as possible.").  Plaintiffs asserted in oral argument that Dr. Lehmann's report would make this point even more credibly, but the Court cannot conclude that enhanced credibility satisfies the special showing required to overcome work product protection.  *See Baker v. Gen. Motors Corp.*, 209 F.3d 1051, 1054 (8th Cir. 2000) ("A party also does not demonstrate substantial need when it merely seeks corroborative evidence.").

It is undisputed that Plaintiffs have access to the same data that Dr. Lehmann relied on in creating the Report.  Docs. 306 at 14; 379 at 28.  Further, "Plaintiffs in other cases have even hired experts to do the same work."  Doc. 379 at 28; *see* Doc. 319-2 at

143-64 (expert report of Dr. Michael Freeman).  Plaintiffs have not made the showing of substantial need or undue hardship required to overcome the Report's work product protection.

### C. Bard did not waive the Report's work product protection.

Plaintiffs argue that Bard waived any claim to work product protection by (1) internal distribution of the report to 12 Bard employees, (2) disclosure of the report in the *Phillips* trial in the District of Nevada, (3) attempting to use work product protection as both a sword and a shield, and (4) using the Report in furtherance of a crime or fraud. *See* Doc. 379 at 20-27.  The Court will address each argument separately.

### 1. Internal distribution of the Report.

"Courts have recognized that work product protection may be lost when the disclosure substantially increases the opportunity for potential adversaries to obtain the information." *Bickler*, 266 F.R.D. at 384 (quotation marks and citation omitted).  Bard contends that its distribution of the Report to 12 internal employees did not substantially increase the opportunity for Plaintiffs to obtain the Report.  The Court agrees.

Passero distributed the Report to five people, including Bard's general counsel, with instructions that it was confidential and distribution "should be limited."  Doc. 319-2 at 3, ¶ 11, 36-37.  Passero testified that she distributed the report internally because the Report recommended that Bard promptly take certain steps and she thought it important to give it "to people who would know what to do with that information."  *Id.* at 37.  Eventually, the Report was distributed to a total of 12 Bard employees.  *See* Doc. 319-2 at 140-41, ¶¶ 3-4.

Plaintiffs argue that the Report was circulated without restrictions.  They cite deposition testimony of Dr. Ciavarella that "he received the Report 'without restriction' as to its use," and that he was "*never instructed that the Report was secret or prepared in anticipation of litigation*."  Doc. 379 at 10 (emphasis by Plaintiffs).  Plaintiffs' Exhibit 5 contains several pages of Dr. Ciavarella's deposition transcript, but none of them contains this testimony.  *See* Doc. 445-2 at 1-9.  The Court therefore cannot consider Ciavarella's

statement in context.  But even if it was made as quoted by Plaintiffs and is accepted as true, the Court cannot conclude that one high-level employee's receipt of the Report without Passero's restrictions substantially increased the risk that the Report would be distributed outside of Bard.  Every page of the Report was labeled "[p]rivileged and confidential" and "[a]ttorney work product."  Doc. 335 at 13-46.  In addition, Bard's internal policies state that communications between Bard's legal counsel and its employees are to be kept confidential, as are documents created in anticipation of litigation.  Doc. 319-2 at 2, ¶ 5.

The Court concludes that Bard's internal distribution of the Report to 12 employees did not substantially increase the opportunity for Plaintiffs or others outside of Bard to obtain the Report.  *Bickler*, 266 F.R.D. at 384.

### 2.      Disclosures of the Report in the *Phillips* trial.

Courts have been willing to preserve a document's work product protection where an earlier disclosure of the document was compelled.  *Bickler*, 266 F.R.D. at 384 (citation omitted); *see also Shields v. Sturm, Ruger & Co.*, 864 F.2d 379, 382 (5th Cir. 1989) ("When a party is compelled to disclose privileged work product and does so only after objecting and taking other reasonable steps to protect the privilege, one court's disregard of the privileged character of the material does not waive the privilege before another court.").  In *Phillips v. Bard*, No. 3:12-CV-344-RCJ-WGC (D. Nev. Feb. 2, 2015), the Report was admitted into evidence during trial over Bard's work product objection.  *See* Doc. 306-1 at 150-55; 159-60.  Bard argues that this compelled disclosure did not amount to waiver.  The Court agrees.

Bard took reasonable steps to protect the Report's confidential nature during the *Phillips* trial.  Bard objected to the Report's use at trial, argued against its admission during a hearing in the middle of trial, and objected again when the Report was actually introduced in evidence.  *See* Doc. 306-1 at 150-55, 159-60.  The Court is not persuaded by Plaintiffs' argument that "Bard failed to timely request that [the] Report (and other trial exhibits) be sealed."  Doc. 379 at 27.  Bard actively opposed the use of the Report

during trial and moved to seal the Report at the conclusion of the trial.  Doc. 412 at 15.

Bard's compelled disclosure was not a waiver of its work product protection.  *Bickler*,

266 F.R.D. at 384; *Shields*, 864 F.2d at 382.

### 3.    Sword and shield argument.

The attorney-client privilege and work product protection may not be used as both

a sword and a shield.  "Where a party raises a claim which in fairness requires disclosure

of the protected communication, the privilege may be implicitly waived."  *Columbia*

*Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1196

(9th Cir. 2001) (quotation marks and citations omitted).

Plaintiffs assert that Bard has selectively quoted the Report in several documents,

including the December 17, 2004 HHE (Doc. 306-1 at 52-56) and the January 4, 2005

RAP (*id.* at 39-50).  Both the HHE and the RAP do repeat the Report's findings that the

Recovery Filter was experiencing significantly higher reporting rates of adverse events

than comparable filters.  *See id.* at 44, 53.  The documents also convey some of the

Report's limitations, such as the lack of reliable data and the need to conduct follow-up

research.  *See id.*  But Plaintiffs do not show how this use of the Report constitutes a

sword.  The sword-shield rulings stand for basic fairness – a party should not be allowed

to use work product affirmatively to gain some advantage in litigation, and at the same

time withhold the work product from scrutiny by asserting the work product protection.

The use of data and conclusions from the Report in internal Bard documents, such as the

RAPs and the HHEs, does not amount to such affirmative use, and fairness therefore does

not demand disclosure of the full document.

Plaintiffs also point to representations that Bard made to "the FDA and the

medical community that the Recovery [Filter] failed at the same rate as competition

models while knowing from the Report that this was not true."  Doc. 379 at 21-22 (citing

Doc. 443-1 at 5-8).  For support, Plaintiffs cite an April 15, 2004 email from Dr.

Lehmann.  Doc. 443-1 at 5-8.  But this email does not support Plaintiffs' position.  At the

time, Dr. Lehmann could not have known from the Report that the Recovery Filter was

failing at higher rates than its competitors because the Report had not been created – it was not issued for another eight months. What is more, making a public statement contrary to what is contained in work product does not constitute use of the work product as a sword. The work product is not used at all in such a communication. The work product may contradict the public statement, but the sword-shield basis for waiver does not turn on impeachment value; it turns on the unfairness of using a document to make an affirmative assertion for one's advantage while simultaneously withholding the document from scrutiny. Dr. Lehmann's email did not do that.

### 4. Crime-fraud exception.

The attorney-client privilege and work product protection do not apply to communications made or work done in furtherance of a crime or fraud. *In re Grand Jury Proceedings*, 87 F.3d 377, 381 (9th Cir. 1996); *United States v. Zolin*, 491 U.S. 554, 562-63 (1989); *In re Richard Roe, Inc.*, 68 F.3d 38, 40 n.2 (2d Cir. 1995) (work product). A party that invokes the crime-fraud exception must show that: (1) "the client was engaged in or planning a criminal or fraudulent scheme when it sought the advice of counsel to further the scheme," and (2) the work product was sufficiently related to and was made in furtherance of the intended, or present, continuing illegality. *In re Napster, Inc. Copyright Litig.*, 479 F.3d 1078, 1090 (9th Cir. 2007) (quotation marks and citations omitted), *abrogated on other grounds by Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100 (2009).

Plaintiffs argue that the crime-fraud exception can be established merely by showing "reasonable cause" to believe that the legal services were used to promote an unlawful scheme. Doc. 379 at 22. But the case law cited by Plaintiffs concerns grand jury proceedings, and the Ninth Circuit has noted that there is reason to apply a lower standard in such proceedings – which require speed and simplicity – than in civil cases. *In re Napster*, 479 F.3d at 1094. The Ninth Circuit has held that a party in a civil case must establish the crime-fraud exception by a preponderance of the evidence when challenging attorney-client communications. *Id.* at 1094-95 ("For several reasons, we

conclude that in a civil case the burden of proof that must be carried by a party seeking outright disclosure of attorney-client communications under the crime-fraud exception should be preponderance of the evidence."). Plaintiffs do not address this holding, nor do they provide reason for the Court to conclude that a different standard should apply to work product protection. The Court concludes that the preponderance of the evidence standard should be applied to this work product challenge.[5]

In an opening footnote on this issue, Plaintiffs cite a recall of another Bard product in 1990, criminal charges brought in 1993 against Bard related to other products, two MDL proceedings against Bard, and Bard's settlement of a qui tam lawsuit. Doc. 379 at 23-24 n.15. Plaintiffs provide no evidence linking these events to this case. Moreover, the crime-fraud exception does not apply to past conduct. *Zolin*, 491 U.S. at 562-63.

Plaintiffs assert that Bard committed a "cover up of adverse testing, injuries, and deaths associated with its filters," which they contend is both fraudulent and criminal. Doc. 379 at 24. Plaintiffs produce the following evidence: Bard learned of the first reported death associated with the Recovery Filter in February 2004; in response, Bard formed a Crisis Communication Team; in April 2004, a Bard executive emailed Dr. Lehmann expressing concern about the Recovery Filter's mortality rate; in July 2004, Bard issued an HHE that showed the Recovery Filter had a failure rate 28 times higher than other filters; the Report showed high rates of adverse events associated with the Recovery Filter; and witnesses have testified about the Recovery Filter's high rate of adverse events. *Id.* at 24-25. Plaintiffs assert that Bard committed fraud by not reporting this information to the FDA, doctors, and patients, and by failing to issue a product recall.

Bard presents contrary evidence and arguments. Doc. 412 at 13. Bard notes that

---

[5] The Court finds that the four reasons given by the Ninth Circuit for adopting the preponderance standard for challenges to attorney-client communications apply as well to work product: (1) the importance of the work product protection has been recognized since *Hickman v. Taylor*, 329 U.S. 495 (1947); (2) the *prima facie* standard is not inconsistent with a preponderance standard; (3) Federal Rule of Evidence 104(a) applies to admissibility questions regarding work product and calls for a preponderance standard; and (4) the problem of limited access to proof is mitigated by the possibility of *in camera* review as well as the substantial need exception to work product protection. *See In re Napster*, 479 F.3d at 1095-96.

the two deaths, which led to creation of the Crisis Communications Team, were both reported to the FDA.  Doc. 319 at 32, 44.  In addition, the adverse outcome rates set forth in the Report were based on adverse events in the MAUDE database, which is maintained by the FDA.  Doc. 335 at 14.  Bard thus asserts that FDA was fully aware of the deaths and adverse events Plaintiffs rely on for their fraud allegations.  Bard also cites evidence of additional adverse-event-rate disclosures to the FDA in October 2004.  Doc. 412 at 13.  Bard further cites evidence that migration rates for the Recovery Filter were well below rates reported in medical literature for all IVC filters (Doc. 412 at 12), and that the overall adverse event rates for the Recovery Filter were small (*id.*).  Finally, Bard notes that the FDA, which is aware of Recovery Filter adverse event rates, has never suggested that the Recovery Filter be recalled.  *Id.* at 13.

Given the parties' conflicting evidence and allegations, the Court cannot find by a preponderance of the evidence that Bard engaged in fraudulent or criminal conduct.  Plaintiffs have failed to carry their burden of proving the crime-fraud exception.

## IV.     Additional discovery or evidentiary hearing.

If the Court is inclined to reject their arguments, Plaintiffs ask for additional discovery and an evidentiary hearing.  The Court declines this request for two reasons.

First, this issue has already been litigated in many state and federal courts that preceded this MDL.  Thirteen court decisions have found the Report to be protected work product.[6]  Four have found the Report subject to discovery.[7]  The Court does not find

---

[6] *Alexander v. Bard*, No. 3:12-CV-05187-O-BK (N.D. Tex.); *Barkley v. Bard*, No. CV2011-021250 (Ariz. Super. Ct.); *Carr v. Bard*, 297 F.R.D. 328 (N.D. Ohio 2014); *Cason v. Bard*, No. 1:12-CV-01288-MHS (N.D. Ga.); *Ebert v. Bard*, No. 5:12-CV-01253-LS, 2014 WL 1632155 (E.D. Pa. Apr. 24, 2014); *Jones v. Bard*, No. 3:13-CV-00599-K (N.D. Tex); *Kilver v. Bard*, No. 1:13-CV-01219-MMM-JEH (C.D. Ill.); *Leus v. Bard*, No. 13-CV-00585-W-GAF (W.D. Mo.); *Peterson v. Bard*, No. 3:13-CV-00528-JJR-RLB (M.D. La.); *Phillips v. Bard*, 290 F.R.D. 615 (D. Nev. 2013) (Cobb, M.J.); *Rackliff v. Bard*, No. CV2011-021206 (Ariz. Super. Ct.); *Stesney v. Bard*, No. CV2012-006103 (Ariz. Super. Ct.); *Towlson v. Bard*, No. CV2011-022334 (Ariz. Super Ct.).

[7] *Giordano v. Bard*, No. 37-2011-00069363-CU-PO-EC (Cal. Super. Ct.); *Payne v. Bard*, No. 6:11-CV-01582-ORL-37GJK (M.D. Fla.); *Phillips v. Bard*, No. 3:12-CV-00344-RCJ-WGC (D. Nev.) (Jones, J.); *Tillman v. Bard*, No. 3:13-CV-00222-J-34JBT (M.D. Fla.).

these four decisions persuasive.  In one, *Giordano v. Bard*, the California Superior Court denied Bard's attempt to clawback the inadvertently produced Report without providing any comment or analysis.  Doc. 306 at 4-5 n.2.  In two others – *Tillman v. Bard* and *Payne v. Bard* – Magistrate Judge Toomey of the Middle District of Florida applied the more rigorous "primary purpose" work product standard, which protects "documents prepared principally or exclusively to assist in anticipated or ongoing litigation."  *See* Doc. 443-1 at 110-132.  The fourth case, *Phillips v. Bard*, actually involved two conflicting decisions in Nevada Federal District Court.  After briefing and a hearing, Magistrate Judge Cobb held that the Report was protected work product.  *See* Doc. 306-1 at 120-24, 133, 139-141.  During trial, the plaintiff in *Phillips* sought to place the Report in evidence, Bard objected, and District Judge Jones – without the benefit of briefing – overruled the objection.  *Id.* at 152-54.  Thus, the four decisions which found the Report discoverable either were made without explanation, applied a different legal standard than the Ninth Circuit's "because of" test, or were made without briefing.

Moreover, the fact that the Report has been litigated more than 15 times in a wide range of courts shows that it has been the subject to ample discovery and argument.  And as noted above, it was the subject of an evidentiary hearing in *Alexander v. Bard*, in the Northern District of Texas.  The plaintiff's lawyers in that hearing are members of the Plaintiffs' Steering Committee in this MDL.  *See* Doc. 319-2 at 7.  Bard was represented by the same lawyers who are representing it in this MDL.  *See id.* at 8.

Given this prior litigation history, the Court cannot conclude that Plaintiffs have been disadvantaged in any way by a lack of discovery or opportunity to develop their arguments.  *See* Fed. R. Civ. P. 26(b)(2)(C)(ii).

Second, the evidence the Court has considered in making this decision does not suggest that an evidentiary hearing is needed.  The testimony of Passero and Lehmann is consistent with the documentary evidence.  Plaintiffs have presented no evidence that causes the Court to think this is a difficult evidentiary issue requiring in-person credibility determinations.  In short, this is not a close question.  The Court therefore will

1   deny Plaintiffs' request for additional discovery and an evidentiary hearing.  There are

2   more relevant and productive tasks to be completed in this MDL.

3   **V.      Effect of this ruling on prior rulings in other cases.**

4          The parties agree that this Court's ruling should not affect any prior rulings on this

5   issue in other cases.  *See* Docs. 306 at 21-23; 379 at 29-30.  The Court agrees.  This

6   ruling shall operate prospectively only, and shall apply in all MDL cases where the issue

7   has not previously been decided.

8   **VI.     Conclusion.**

9          The Court finds that Bard will suffer specific prejudice or harm if Plaintiffs are

10  permitted to use a Report entitled to work product protection in discovery or at trial.

11  Bard has shown good cause for a protective order.  *San Jose Mercury News*, 187 F.3d at

12  1103; *Phillips*, 307 F.3d at 1210-11.

13         **IT IS ORDERED:**

14         1.      Defendants' motion for a protective order (Doc. 306) is **granted**.  Dr. John

15  Lehmann's December 15, 2004, report is protected work product pursuant to Federal

16  Rule of Civil Procedure 26(b)(3).  Plaintiffs may not use or rely on the report in any

17  pending or future case in this MDL.  This order shall not affect any transferor courts'

18  previous orders regarding the discoverability or use of Dr. Lehmann's report.

19         2.      Defendants' unopposed motion to seal (Doc. 413) is **granted**.  The Clerk is

20  directed to accept for filing under seal the document lodged on the Court's docket as

21  Doc. 414.

22         Dated this 11th day of February, 2016.

23

24

25  _____

26                     David G. Campbell
                    United States District Judge

27

28

**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| **IN RE: BARD IVC FILTERS PRODUCTS LIABILITY LITIGATION** <br><br> **This Order Relates to: All Actions** | MDL No. 15-2641 PHX DGC |

This dispute concerns documents withheld from discovery under the attorney-client privilege and the work-product doctrine by Defendants C.R. Bard, Inc. and Bard Peripheral Vascular, Inc. ("Bard"). Plaintiffs challenge a substantial number of documents on Bard's privilege log. Plaintiffs sampled 307 documents on the log, which represents five percent of the total. After meeting and conferring, the parties reached agreement on all but 133 of the sampled documents. The resolution of this discovery dispute will be used to guide the parties as they attempt to resolve the overall privilege dispute in this multi-district litigation ("MDL").

On March 25, 2016, Plaintiffs moved to compel production of the 133 disputed documents. Doc. 1214. On March 31, 2016, the Court held a third case management conference where the issue was discussed (Doc. 1246), and the Court provided additional guidance in the ensuing case management order (Doc. 1319 at 5-6). The issues have now been fully briefed (Docs. 1476, 1590, 1976, 2219, 2222), and the Court heard oral arguments on June 21, 2016. The Court has also reviewed the representative sample documents submitted by the parties. For the following reasons, the Court will grant in part and deny in part Plaintiffs' motion to compel.

## I.      Choice of Law.

The parties agree that the work-product doctrine is governed by federal law, but disagree on which law should govern the attorney-client privilege.  The parties' briefing suggests four possibilities: (1) generally applicable common law, (2) Arizona law, (3) New Jersey law, or (4) the law of each transferor district.

### A.      Choice of Law Approaches.

Federal Rule of Evidence 501 provides that "in a civil case, state law governs privilege regarding a claim or defense for which state law supplies the rule of decision." Fed. R. Evid. 501.  "Rule 501, however, does not tell us which state law the forum state should apply."  *KL Grp. v. Case, Kay & Lynch*, 829 F.2d 909, 918 (9th Cir. 1987). Commentators have suggested several methods of resolving this choice-of-law issue: (1) use the privilege law of the state whose substantive law provides the rule of decision; (2) apply the privilege law of the state in which the federal court sits; or (3) apply the conflict-of-law doctrine of the state in which the federal court sits.  *Id.* (citing 23 C. Wright & K. Graham, Jr., Federal Practice and Procedure § 5435, at 865-69 (1980); 2 Weinstein's Federal Evidence § 501[02] (1986)).

The issue is complicated in the MDL context, where cases originate in many different states.  In *In re Yasmin and Yaz (Drospirenone) Marketing, Sales Practices and Products Liability Litigation*,  MDL No. 2100, 2011 WL 1375011, at *1 (S.D. Ill. Apr. 12, 2011), the court addressed a privilege challenge to 330 documents, a representative sample of the 12,857 documents withheld as privileged.  Consistent with Rule 501, the Court found that "privilege matters that are relevant to an element of a claim or defense for which state law supplies the rule of decision will be governed by state privilege law." *Id.* at *7.  The court recognized that "a federal court sitting in diversity applies the choice of law rules emanating from the state in which it sits," and that, in the MDL context, "the transferee court applies the choice of law rules of the state in which the transferor court sits."  *Id.* at *4.  After surveying the choice of law principles of every state, the court decided to apply the "most significant relationship" test found in Restatement (Second) of

Conflict of Laws § 139 (Am. Law Inst. 1971).  The court found that in most states, "the law of the state with the most significant relationship to the communication will govern the existence and scope of attorney-client privilege."  *Id.* at *9.[1]

Other cases have adopted different approaches.  *See In re Vioxx Prods. Liab. Litig.*, MDL No. 1657, 501 F. Supp. 2d 789, 791-92 (E.D. La. 2007) (applying generally-known principles of the attorney-client privilege); *In re Baycol Prods. Litig.*, MDL No. 1431, 2003 WL 22023449, at *1-2 (D. Minn. Mar. 21, 2003) (applying the choice-of-law rules of the state where the transferee court sits); *U.S. Surety Co. v. Stevens Family Ltd.*, No. 11-C-7480, 2014 WL 902893, at *1 (N.D. Ill. Mar. 7, 2014) (applying the privilege law of state that supplies the substantive rule of decision).

After considering these various approaches, the Court agrees with *Yasmin*, which looked to the transferor states' choice of law rules to determine which privilege law to apply.  This approach comports with the Supreme Court's instruction that federal courts should look to state conflict laws as well as substantive laws.  *See Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487, 496-97 (1941).  The Court also agrees with *Yasmin*'s selection of the Restatement's most significant relationship test as best representative of the choice of law rules applied by the various states.  2011 WL 1375011, at *7.  The parties also agree.  Docs. 1476 at 6; 1590 at 2.  Thus, the Court will use Restatement § 139 to identify the privilege law to be applied in this case.

### B.    Section 139 Analysis.

Part 1 of § 139 provides:  "Evidence that is not privileged under the local law of the state which has the most significant relationship with the communication will be admitted, even though it would be privileged under the local law of the forum, unless the admission of such evidence would be contrary to the strong public policy of the forum."

---

[1] The court also concluded that cases filed directly in the MDL pursuant to its direct-filing order should be treated "as if they were transferred from a judicial district sitting in the state where the case originated."  2011 WL 1375011, at *5-6.  This approach comports with the fourth case management order in this MDL.  *See* Doc. 1485 at 3-4.  Thus, directly-filed cases in this MDL will be treated as if they were transferred from the forum where the case otherwise would have been filed – typically, the state where the plaintiff resides or where the Bard filter was implanted.

Restatement (Second) of Conflict of Laws § 139 (Am. Law Inst. 1971).  Part 2 provides: "Evidence that is privileged under the local law of the state which has the most significant relationship with the communication but which is not privileged under the local law of the forum will be admitted unless there is some special reason why the forum policy favoring admission should not be given effect."  *Id.*  Thus, § 139 applies only when the privilege law of the forum differs from that of the state with the most significant relationship to the allegedly privileged communication.

To determine which state has the most significant relationship, Comment e to § 139 provides this guidance:

> The state which has the most significant relationship with a communication will usually be the state where the communication took place, which, as used in the rule of this Section, is the state where an oral interchange between persons occurred, where a written statement was received or where an inspection was made of a person or thing. . . .  The state where the communication took place will be the state of most significant relationship in situations where there was no prior relationship between the parties to the communication.  If there was such a prior relationship between the parties, the state of most significant relationship will be that where the relationship was centered unless the state where the communication took place has substantial contacts with the parties and the transaction.

*Id.*

In the case of written communications (the only kind of communication at issue in this order), the comment suggests that the state where the communication was "received" has the most significant relationship.  This suggestion, made by the ALI in 1971, is problematic in a day of electronic communications.  Email communications – which represent most of the communication at issue in this motion – usually go back and forth between the communicating parties several times in a single email string, resulting in virtually everyone being the "receiving" party for at least some of the communications.  Email communications can also be "received" by many people in many states simultaneously.  Thus, it may be impossible to determine which party "received" the communication.  Commentators have noted this difficulty with the Comment e approach.

*See* Graham C. Lilly & Molly Bishop Shadel, *When Privilege Fails: Interstate Litigation and the Erosion of Privilege Law*, 66 Ark. L. Rev. 613, 643 (2013) ("determining the state with the 'most significant relationship' may prove problematic with electronic communication").

This case provides an apt example.  The first communication at issue in this motion (Log 2, Control 809) is just over one page long, and yet it includes an initial email between two people on July 15, 2005; a response copied to three more people on July 17, 2005; a forwarding of the email to still another person on July 18, 2005; and a response from the recipient of the forwarded email that is addressed to five new individuals and copied to one new individual, in addition to those already in the email chain.  Three communications, among a total of 12 people, over the course of four days render it virtually impossible to determine where this communication was "received."  To make matters more difficult, the parties have not provided the Court with the roles and locations of many of the people on this email, and this is just one of dozens the Court must review.  Many of the documents at issue in this motion include the same kind of back-and-forth among many persons over the course of several days.

The Court concludes that it would make little sense to find that the state with the most significant relationship – and therefore the applicable privilege law – varies from email to email, or maybe even within a single email string, depending on whom happens to be copied and whom the Court deems to be the primary recipient.  The Court finds that the "received" test for written email communication is simply not workable in this case.[2]

The Court need not dwell longer on this issue, however, because the other part of Comment e suggests that if the parties to the communication in question had a prior relationship, then the state where that relationship was "centered" will usually be the state with the most significant relationship.  This approach provides a workable solution for this case.  The communications in question appear primarily to be among Bard in-house

---

[2] The Court notes that Comment e says the place where the written communication is received will "usually" be the state with the most significant relationship, leaving room for other approaches.

lawyers, based at C.R. Bard headquarters in New Jersey, and managers and employees of Bard Peripheral Vascular ("BPV"), located in Arizona. The subject of this litigation is the design and performance of filters made and sold by BPV, as well as the marketing and compliance efforts of BPV. Thus, although lawyers and paralegals for Bard may be based in New Jersey, it appears their client for purposes of these communications, as well as the subject of their communications, is primarily BPV and its activities in Arizona.

This appearance is confirmed by the evidence. BPV is a wholly-owned subsidiary of C.R. Bard. Doc. 2219-1 at 2, ¶ 3. BPV is headquartered in Arizona, *id.*, and "is the company that was and is primarily responsible for all activities related to" the filters at issue in this case, *id.*, ¶ 4.

> From its headquarters in Tempe, Arizona, [BPV] had and continues to have principal responsibility in designing the filters, testing the filters, directing the manufacturing of the filters, developing contents of the instructions for use that accompanies the filters, communicating with the FDA regarding the filters, developing marketing material for the filters, training the sales force regarding interacting with physicians about [the] filters, developing written communications to physicians related to the filters, developing and maintaining a quality and post-market surveillance system regarding the filters, and deciding when each new generation of filter is first marketed and the previous filter stops being marketed.

*Id.*, ¶ 5. BPV is responsible for managing its own day-to-day operations. Doc. 2219-2 at 3-4. C.R. Bard is responsible for setting "corporate quality standards or guidance[] that the divisions would need to follow at a global level," *id.* at 4, but the divisions act as "their own business that reports back up to Bard corporate or C.R. Bard," *id.* at 5. C.R. Bard's legal department acts as "a full functioning legal department" covering "[a]ll matters of legal breadth," and the legal work for BPV. *Id.* at 6.

Given these facts, and the reality that lawyers advise clients on the clients' activities and issues, not the lawyers' activities and issue, the Court concludes both that there was a preexisting relationship between the Bard in-house lawyers and BPV, and that the relationship can most accurately be described as "centered" in Arizona. That is where products are developed, marketing materials are written, FDA communications

originate, training occurs, testing is done, and legal advice is needed, received, and acted upon.

The authors of the law review article cited above reach a similar conclusion. They note that "[s]ince privileges primarily benefit their holders – such as a client or patient – identifying the holder should be an important indication of which state has the most significant relationship to the communication." Lilly & Shadel, 66 Ark. L. Rev. at 649. The privilege holder's "affiliation with competing states is of paramount importance" and "should be a primary factor in determining which state has the most significant relationship to a communication." *Id.*

The Court concludes that the preexisting relationship between the parties to the communications at issue in this case was centered in Arizona, and that Arizona therefore has the most significant relationship to the communications.[3] As a result, the Court will apply the privilege law of Arizona. Because Arizona also is the forum where this Court is located, the Court need not further apply the conflict resolution principles set forth in parts 1 and 2 of § 139.[4]

### C.      Plaintiffs' Arguments.

Plaintiffs argue that New Jersey is the state with the most significant relationship to the communications, but the evidence does not support this conclusion. It is true that C.R. Bard's corporate center, including its legal department, is located in New Jersey.

---

[3] Comment e says the state of the preexisting relationship controls "unless the state where the communication took place has substantial contacts with the parties and the transaction." Restatement § 139, cmt. e. Because the state where the communication took place is so difficult to identify given the nature of the electronic communications at issue, the Court does not view this part of the comment as helpful or controlling.

[4] The Court notes that if the Court adopted Plaintiffs' argument that New Jersey has the most significant relationship, and if New Jersey privilege law provided that a particular communication was not privileged, the Court likely would nonetheless apply Arizona law if it would hold the communication privileged. Section 139(1) provides that the forum's law governs if admission of the evidence in question would be contrary to the strong public policy of the forum. The Court views A.R.S. § 12-2234 – the Arizona statute that governs the corporate attorney-client privilege – as a strong public policy. The statute was passed by the Arizona Legislature and signed by the Governor in response to an Arizona Supreme Court decision that weakened the corporate privilege, and has remained unchanged for more than 20 years. *See Roman Catholic Diocese of Phx. v. Super. Ct.*, 62 P.3d 970, 974 (Ariz. Ct. App. 2003).

But the evidence shows that C.R. Bard was not involved in the management of day-to-day operations of BPV and, as discussed above, virtually all of the relevant conduct and events occurred at BPV. The fact that Bard's legal department is located in New Jersey is not dispositive, particularly when the relevant client, BPV, is located in Arizona.

Plaintiffs argue that "in the intra-corporate context, the parent and wholly-owned subsidiary should be treated as one entity." Doc. 2222 at 4. Plaintiff cite *Teleglobe Communications Corp. v. BCE Inc.*, 493 F.3d 345 (3d Cir. 2007), but that case addressed the effect of disclosing an otherwise privileged attorney-parent communication to the parent's subsidiary, *see id.* at 369-74. It did not address the complicated choice-of-law issue presented in this case.

Plaintiffs argue that "it is reasonable to presume that Bard's lawyers relied on New Jersey law" when advising BPV. Doc. 2222 at 4-5. The Court does not agree. Plaintiffs' own cases suggest that lawyers typically apply the laws of their client's state when providing guidance. *See, e.g.*, *Compuware Corp. v. Moody's Investors Servs., Inc.*, 222 F.R.D. 124, 133 (E.D. Mich. 2004) (holding that New York company's lawyers advising on privilege "surely relied on the protections of New York law").

Plaintiffs assert that Bard's litigation counsel never mentioned Arizona law in the parties' meet and confer process, involving "claims going back several years" in related cases. Doc. 2222 at 5. While this may support an estoppel argument, which Plaintiffs have not made, it is does not address the choice of law issue.

Plaintiffs assert that Bard "is hardly a major employer in Arizona" and that BPV "does not specifically market in Arizona, has no retail locations here, and some of its products including IVC filters are manufactured elsewhere." Doc. 2222 at 5. But Plaintiffs do not dispute that BPV is an Arizona corporation with its principal place of business here. The relevant question is not the significance of BPV's presence in Arizona, but where the relationship between BPV and its lawyers was centered. For reasons discussed above, the Court concludes that the relationship was centered in Arizona, the location of the activities for which the legal advice was provided.

## II.     Legal Standard.

### A.     Attorney-Client Privilege.

The attorney-client privilege "is rigorously guarded to encourage full and frank communications between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice." *State v. Sucharew*, 66 P.3d 59, 64, ¶ 10 (Ariz. Ct. App. 2003) (citing *State v. Towery*, 920 P.2d 290, 299 n.6 (Ariz. 1996) (internal quotation marks omitted)). "The privilege belongs to the client and encompasses communication between the attorney and client made in the course of the attorney's professional employment." *Id.* (citing *State v. Holsinger*, 601 P.2d 1054, 1058 (Ariz. 1979)). "The burden of showing the relationship, the confidential character of the communication, and other necessary facts, is that of the party claiming the privilege." *State v. Sands*, 700 P.2d 1369, 1374 (Ariz. Ct. App. 1985) (citation omitted).

In Arizona, the corporate attorney-client privilege is codified at A.R.S. § 12-2234:

A.     In a civil action an attorney shall not, without the consent of his client, be examined as to any communication made by the client to him, or his advice given thereon in the course of professional employment.   An attorney's paralegal, assistant, secretary, stenographer or clerk shall not, without the consent of his employer, be examined concerning any fact the knowledge of which was acquired in such capacity.

B.     For purposes of subsection A, any communication is privileged between an attorney for a corporation, governmental entity, partnership, business, association or other similar entity or an employer and any employee, agent or member of the entity or employer regarding acts or omissions of or information obtained from the employee, agent or member if the communication is either:

1.     For the purpose of providing legal advice to the entity or employer or to the employee, agent or member.

2.     For the purpose of obtaining information in order to provide legal advice to the entity or employer or to the employee, agent or member.

C.     The privilege defined in this section shall not be construed to allow the employee to be relieved of a duty to disclose the facts solely because they have been communicated to an attorney.

1   "Based on its express terms, the statute protects from disclosure communications between

2   a corporation's attorney – or his 'paralegal, assistant, secretary, stenographer or clerk' –

3   and 'any employee, agent or member of the entity or employer regarding acts or

4   omissions of or information obtained from the employee agent or member'" if it is "'[f]or

5   the purpose of obtaining information in order to provide legal advice to the entity or

6   employer or to the employee, agent or member.'"  *Salvation Army v. Bryson*, 273 P.3d

7   656, 662-63 (Ariz. Ct. App. 2012) (citations omitted).

8           **B.      Work-Product Doctrine.**

9           "Ordinarily, a party may not discover documents and tangible things that are

10   prepared in anticipation of litigation or for trial by or for another party or its

11   representative (including the other party's attorney, consultant, surety, indemnitor,

12   insurer, or agent)."  Fed. R. Civ. P. 26(b)(3)(A).  Courts in the Ninth Circuit use the

13   "because of" test to determine whether dual-purpose documents were prepared in

14   anticipation of litigation:

> In circumstances where a document serves a dual purpose, that is, where it
> was not prepared exclusively for litigation, then the "because of" test is
> used.  Dual purpose documents are deemed prepared because of litigation if
> in light of the nature of the document and the factual situation in the
> particular case, the document can be fairly said to have been prepared or
> obtained because of the prospect of litigation.  In applying the "because of"
> standard, courts must consider the totality of the circumstances and
> determine whether the document was created because of anticipated
> litigation, and would not have been created in substantially similar form but
> for the prospect of litigation.

22   *United States v. Richey*, 632 F.3d 559, 567-68 (9th Cir. 2011) (quotation marks and

23   citations omitted).  The party invoking work-product protection bears the burden of

24   proof.  *Conoco Inc. v. U.S. Dep't of Justice*, 687 F.2d 724, 728 (9th Cir. 1982).

25   **III.   Application.**

26           The parties have identified several categories of documents that are in dispute, and

27   have submitted for *in camera* review a binder of sample documents selected by the

28   parties (*see* Doc. 1319) and a matrix addressing the samples.  The categories have been

1   identified by Plaintiffs, and are described in a letter dated April 4, 2016, from Plaintiffs'

2   counsel to Bard's counsel.   *See* Doc. 1476-3.   This order will follow the category

3   numbering from the letter.

4       **A.     Category 1a.**

5       Plaintiffs' first category involves communications "where Defendants have failed

6   to establish [that] the communication evidences a request made to or from a lawyer for

7   the purpose of obtaining or providing legal advice of the lawyer," specifically, "[e]ntries

8   where non-attorney employees are alleged to have given legal advice independent of a

9   lawyer." Doc. 1476-3 at 2.   Plaintiffs make three general arguments: (1) there is no

10  lawyer involved in the communications; (2) Bard has failed to provide facts suggesting

11  how the matter being discussed is of legal importance; and (3) any privilege that may

12  have attached was waived by the presence of a third party.

13      Arizona's corporate attorney-client privilege protects a communication by an

14  attorney's "paralegal, assistant, secretary, stenographer or clerk" if it would otherwise be

15  privileged.  A.R.S. § 12-2234(A), (B); *see also Salvation Army*, 273 P.3d at 662-63.  To

16  be protected, a communication must be made for the purpose of providing legal advice or

17  obtaining information to provide legal advice.  A.R.S. § 12-2234(B)(1), (2).  The fact that

18  a communication includes a party's agent does not destroy the privilege.  A.R.S. § 12-

19  2234(B); *Salvation Army*, 273 P.3d at 662-63.

20      Bard provided an affidavit from Candace Camarata, who serves as Bard's assistant

21  general counsel for litigation.[5]  The affidavit establishes the following.  Bard's Law

22  Department routinely provides BPV's employees with legal advice, including advice

23  about ongoing litigation.   Doc. 1476-9 at 2, ¶¶ 2-3.   Bard's lawyers often utilize

24  paralegals, referred to as either a "Litigation Manager" or a "Trademark Manager," to

25  facilitate these communications.  *Id.*, ¶ 3.  Due to Bard's size, these messages must often

26  _____

27      [5] Plaintiffs object to the Court's reliance on Ms. Camarata's affidavit because she
    lacks personal knowledge of any communications to which she was not a party.  The
28  Court views Ms. Camarata's affidavit as attesting to procedures of Bard's Law
    Department in general, such as the general types of legal advice given and how paralegals
    are utilized by in-house counsel.  Ms. Camarata has personal knowledge of these facts.

be forwarded to others within the company who need the information to perform their jobs. *Id.* at 3. ¶ 7.

The parties have provided the Court with five Category 1a documents. Each communication involves at least one Bard paralegal.

The first disputed Category 1a communication – Log 2, Control 809 – is an email string containing four separate messages. In the first message, an employee emails a litigation paralegal about a pending case. The paralegal responds, while adding additional legal personnel, including another paralegal and an in-house lawyer. The paralegal asks the initial author of the email to forward her message to other individuals in the author's department. The message is then forwarded twice, and a consultant is copied on the final message. The consultant, Richard Bliss, is a former Bard employee who worked full time at BPV in Arizona under a consulting contract, serving as Head of Quality and Regulatory while Bard searched for a permanent employee to fill that position. Doc. 1476-8 at 3, ¶ 5. The Court concludes that Bliss constituted an agent within the meaning of § 12-2234(B). Because this email string consists of communications between Bard employees or agents and a paralegal, concerning ongoing litigation, the Court concludes that it falls within the protection of A.R.S. § 12-2234. *Salvation Army*, 273 P.3d at 662-63 ("the statute protects from disclosure communications between a corporation's attorney – or his paralegal, assistant, secretary, stenographer or clerk – and any employee, agent or member of the entity or employer . . . [f]or the purpose of obtaining information in order to provide legal advice to the entity or employer or to the employee, agent or member.") (quotation marks omitted).

Log 6, Control 8 consists of two cells from a larger spreadsheet apparently tracking specific complaints regarding Bard filters. The cells include a "comments" section in which various employees make dated entries regarding facts or events related to the complaint. Bard redacted two entries that reflect communications from paralegals regarding litigation and investigation of a complaint. Because the redacted portions contain internal communications from Bard's legal personnel, the Court concludes that

they are protected by Arizona's attorney-client privilege.

Upon review of the other Category 1a documents – Log 6, Control 193; Log 3, Control 3184; and Log 3, Control 2244 – the Court concludes that they are privileged under the Arizona statute. They reflect communications to or from Bard paralegals seeking information needed for legal advice. The Court therefore denies Plaintiffs' motion to compel production of documents in Category 1a.

## B.   Category 1b.

Plaintiffs' second category involves communications "where Defendants have failed to establish the communication evidences a request made to or from a lawyer for the purpose of obtaining or providing legal advice of the lawyer," including "[e]ntries where both the author and recipient are non-lawyers and Defendants" failed to provide key information, such as the lawyer asked to provide legal advice, the legal purpose for which the lawyer was consulted, or why disclosure to a non-lawyer was necessary to fulfill that purpose. Doc. 1476-3 at 2.

Plaintiffs challenge the Category 1b documents on many of the same grounds as the Category 1a documents. These communications all generally involve a paralegal, as in Category 1a. The Court concludes that two communications – Log 3, Control 2295, and Log 4, Control 29 – are privileged for the reasons discussed above in Category 1a. They reflect communications to or from Bard paralegals seeking information needed for legal advice. *See Salvation Army*, 273 P.3d at 662-63.

Defendants produced the email at Log 3, Control 3028, but not the attached memorandum. The Court rejects Plaintiffs' argument that the privilege does not apply because the memorandum would not "be deemed a traditionally legal document." The memorandum is addressed to two Bard lawyers, and two others at BPV, and reports on reviews of literature, data bases, and other sources to obtain information regarding risks and complications of particular filters. It also includes a list of known risks. The information contained in the memorandum clearly is of a type that lawyers would consider in advising the company on legal risks, and the Court finds that the

memorandum is covered by Arizona's attorney-client privilege.  A.R.S. § 12-2234(B).

Log 6, Control 191 is a communication between an ESI vendor and Bard employees regarding ESI searches to be done on behalf of Bard's outside counsel in this case, for witnesses that have been mentioned in motions in this case.  It is a document prepared in connection with ongoing litigation, and is protected work product.  Fed. R. Civ. P. 26(b)(3)(A).  As the Court has noted in a previous order, the fact that a document is prepared by non-lawyers and does not include legal advice does not mean that it was not prepared in anticipation of litigation for purposes of Rule 26(b)(3)(A).  Doc. 699 at 8.

Log 3, Control 57 contains redactions in an email chain.  The Court has reviewed the redacted communications.  They include a request for legal advice from an in-house attorney and the attorney's response, and are privileged.

The Court denies Plaintiffs' motion to compel as it pertains to Category 1b.

## C.    Category 2.

This category involves communications that do not show "that any legal advice was given or requested.  In other words, where Defendants have failed to establish that a lawyer was being asked to act as a lawyer – giving advice with respect to the legal implications of a proposed course of conduct."  Doc. 1476-3 at 2.

With respect to Log 2, Control 403, the redacted portion of the email was from Donna Passero, one of Bard's in-house lawyers.  The redacted email language, and the attachment that was withheld, include communications to and from Ms. Passero regarding directions given to Bard sales representatives on statements they could or could not make in their sales activities.  Such communications have important legal implication for Bard, and the communication is privileged.

Log 3, Control 1697 is a redacted email to Tom Conniff, one of Bard's in house lawyers.  It concerns terms of an agreement being drafted, and is privileged.

With respect to Log 6, Control 65, Bard states that it has previously produced the cover email but not the attachment.  The attachment is a spreadsheet titled "Trade Complaints Tracker."  It contains a number of rows and columns, including a column

titled "Status Summary: (Briefly Describe)."  This column sometimes includes questions from specific Bard personnel, as denoted by their initials, to other individuals, also denoted by their initials.  Some of the communications in this column are to or from in-house attorney Gina Dunsmuir.  Bard's arguments with respect to this document do not attempt to show that entire spreadsheet is privileged or created for a privileged purpose.  The portions that reflect internal communications to or from counsel appear to be privileged, but not other portions that reflect facts such as event dates, identities of competitors, and event summaries.  Nor does the Court find that descriptions of counsel's communications with persons outside of Bard are privileged (such as event 3d, column titled "Event Summary").  If Bard has withheld the entire spreadsheet, it should produce a redacted version that redacts only those portions reflecting privileged communications.[6]

Log 3, Control 1694 is an email from outside counsel attaching a draft letter to opposing counsel relating to contract negotiations.  The email requests feedback on the letter, and a response provides feedback.  The communications are privileged.

Log 2, Control 741 is a communication between BPV personnel and at least two Bard lawyers, Gary Mitchell and Gina Dunsmuir.  These communications involve legal advice or the obtaining of information in order to provide legal advice.  They are privileged.

The Court concludes that the four communications in Category 2 are protected by the attorney-client privilege.  The fifth document – Log 6, Control 65 – is only protected to the extent it contains communications covered by the privilege, but not otherwise, and unprivileged portions should be produced.  The Court therefore grants in part and denies in part Plaintiffs' motion to compel as it pertains to Category 2.

**D.    Category 3.**

Category 3 involves "[e]ntries where a business purpose would have provided a sufficient cause for the communications."  Doc. 1476-3 at 2.  For the attorney-client privilege to attach, the communication must have been for the purpose of providing legal

_____

[6] Bard did not invoke the work-product doctrine as to this document.

1    advice or for obtaining information in order to provide legal advice.   A.R.S. § 12-
2    2234(B).

3         The Court already concluded that Log 2, Control 403 is privileged.   Three of the
4    remaining four communications also are clearly privileged.   Log 3, Control 334 is a
5    communication redacted to remove advice received from Bard's legal department.   Log
6    2, Control 794 communicates legal advice of Donna Passero, one of Bard's in-house
7    lawyers.   Log 5, Control 203 conveys information to Ms. Passero, a lawyer, from Dr.
8    Richard Lehmann, Bard's consultant retained by the legal department, regarding a patient
9    death.   Each of these communications involves either the relaying of legal advice or the
10   providing of information to in-house attorneys in connection with risks faced by the
11   company.  A.R.S. § 12-2234(B).  The attorney-client privilege applies.

12        The fifth document, Log 1, Control 115, is a communication from Dr. Lehmann, a
13   consultant retained by Bard's legal department.   The Court has previously found that the
14   legal department retained Dr. Lehmann in 2004 in anticipation of litigation after Bard
15   received notice of adverse events associated with the Recovery Filter.   Doc. 699 at 5.
16   The communication concerns analysis performed by Dr. Lehmann in accordance with
17   Schedule A (Doc. 335 at 9) of his contract with the legal department, and Dr. Richard
18   Holcomb, another consultant to the legal department.   Because Lehman and Holcomb
19   were agents of Bard in performing this work, and the result was communicated to Bard
20   attorney Donna Passero, among other Bard personnel, the Court concludes that it is
21   privileged under the Arizona statute:   "any communication is privileged between an
22   attorney for [an] . . . entity . . . and any . . . agent . . . of the entity . . . [f]or the purpose of
23   obtaining information in order to provide legal advice to the entity."   A.R.S. § 12-
24   2234(B)(2).

25        The Court also finds this document protected by the work-product doctrine.   As
26   noted, the Court previously held that Dr. Lehmann was retained in anticipation of
27   litigation.   Doc. 699.   Plaintiffs argue that this communication also had a business
28   purpose, but a dual purpose document is still protected if it "would not have been created

1  in substantially similar form but for the prospect of litigation." *Richey*, 632 F.3d at 567-

2  68.  The Court cannot conclude that this work would have been done in substantially the

3  same form solely for business reasons.  Nor is the Court persuaded by Plaintiffs' citation

4  to *Phillips v. C.R. Bard, Inc.*, 290 F.R.D. 615, 652-53 (D. Nev. 2013).  The cited pages of

5  that case concern a different email that did not include any legal counsel.  *Id.*

6       The Court denies Plaintiffs' motion to compel production of Category 3

7  documents.

8       **E.    Category 4.**

9       This category involves "[e]ntries where in-house counsel was being asked to edit

10  or comment on non-traditional legal documents (technical, scientific, public relations,

11  management, and marketing) versus traditional legal instruments (contracts for a study,

12  retention of experts, patent applications)."  Doc. 1476-3 at 2.  Arizona  courts  have  not

13  directly addressed the scope of the corporate attorney-client privilege in the context of

14  heavily-regulated industries.  The Court must therefore "use its own best judgment in

15  predicting how [the Arizona Supreme Court] would decide the case," and, in doing so,

16  "may  be  aided  by  looking  to  well-reasoned  decisions  from  other  jurisdictions."

17  *Takahashi v. Loomis Armored Car Serv.*, 625 F.2d 314, 316 (9th Cir. 1980) (citations

18  omitted).

19       In the heavily-regulated industry context, "services that initially appear to be non-

20  legal in nature, like commenting upon and editing television ads and other promotional

21  materials, could, in fact, be legal advice."  *In re Vioxx Prods. Liab. Litig.*, 501 F. Supp. at

22  800.  Some courts use the "primary purpose" standard, which protects communications in

23  which lawyers provide both legal and business services if "counsel was participating in

24  the communications primarily for the purpose of rendering legal advice or assistance."

25  *Id.* at 798.  Other courts employ the "because of" standard, which was developed in the

26  work-product context.  *Phillips v. C.R. Bard, Inc.*, 290 F.R.D. 615, 628 (D. Nev. 2013).

27  Regardless of which standard is employed, the Court must conduct a document-by-

28  document, fact-specific inquiry.  *See S.G.D. Eng'g, Ltd. v. Lockheed Martin Corp.*, No.

CV-11-02493-PHX-DGC, 2013 WL 2297175, at *3 (D. Ariz. May 24, 2013) (adopting special master's report and recommendation).

As an initial matter, Plaintiffs argue that several documents are not privileged because they would not "be deemed a traditionally legal document." This argument is not supported by Arizona's corporate attorney-client privilege, which applies broadly to "any communication." A.R.S. § 12-2234(B).

Four of the five communications – Log 2, Control 293; Log 3, Control 1965; Log 3, Control 423; and Log 4, Control 4 – were made for the primary purpose of providing legal advice or assistance. Each of these communications involves a Bard lawyer providing comments. Although the comments arguably serve both a business and a legal purpose, they appear to be for the primary purpose of providing legal advice. Log 2, Control 293, for example, involves edits by two Bard lawyers, Donna Passero and Judith Reinsdorf, to a communication to the sales force. The communication concerns FDA regulation and adverse events, both of which strongly implicate legal issues, as do the sales force's public representations concerning such matters. Ms. Reinsdorf specifically states that "[w]ith these edits, this email can serve as 'legal's approval.'" The other three documents similarly involve edits of Bard's lawyers on matters implicating legal issues.

Plaintiffs contend that Log 3, Control 1965 cannot be privileged because Bard had an independent duty to produce the documents under 21 C.F.R. § 820.100 and under Bard's own policies and procedures. Even if this is true, it does not lead to the conclusion that Plaintiffs are entitled to communications in which Bard receives legal advice in the document's preparation.

Log 6, Control 54 includes an email chain in which a Bard in-house attorney provides comments on a letter to a doctor apparently affiliated with the Agency for Health Care Research and Quality. The redacted portions of the emails are privileged, as they reflect the attorney's recommendations, and the attorney's suggested edits to the letter are privileged for the same reason. The Court cannot conclude that the attorney

1  was merely performing a business function. Communications with an agency regarding

2  studies of Bard products certainly could have legal implications, and review by counsel

3  of such communications would clearly involve potential legal issues.

4       The Court denies Plaintiffs' motion to compel production of Category 4

5  documents.

6      **F.**    **Category 5.**

7       Category five involves "[e]ntries where both the author and the recipient are non-

8  lawyers and an attorney was merely copied on the communication." Doc. 1476-3 at 3.

9  Arizona's corporate attorney-client privilege law protects communications made for the

10  purpose of providing legal advice or information in order to provide legal advice. A.R.S.

11  § 12-2234(B).

12       Four of the five communications – Log 2, Control 859; Log 2, Control 816; Log 3,

13  Control 3987; and Log 3, Control 3161 – involve communications where a lawyer is

14  involved primarily for the purpose of rendering legal advice or assistance. The redacted

15  portions of Log 2, Control 859, for example, explicitly reference revisions from

16  discussions with outside products liability counsel. Log 2, Control 816 consists of

17  internal Bard communications about draft materials to be sent to the FDA, with an in-

18  house lawyer as a party to the communications. As the communications provide

19  information to a lawyer for the purpose of obtaining legal advice, they fall within A.R.S.

20  § 12-2234(B)(2). Log 3, Control 3987 is a draft of a communication to a regulator,

21  copied to a lawyer. Log 3, Control 3161 involves communications between Bard's

22  lawyers and BPV personnel regarding a research grant request. These communications

23  are privileged because they involve lawyers in the preparation of documents that have

24  potential legal significance. Involving lawyers in such communications provides them

25  with the information needed to provide legal advice on the issues of legal significance.

26  A.R.S. § 12-2234(B).

27       Log 1, Control 114 is a memo from Dr. Lehmann and Richard Holcomb to Bard's

28  medical director, copied to Donna Passero. As noted above, the Court has previously

1   found that the legal department retained Dr. Lehmann in anticipation of litigation after

2   Bard received notice of adverse events associated with the Recovery Filter.  Doc. 699 at

3   5.  The communication concerns analysis performed by Dr. Lehmann in accordance with

4   his contract with the legal department, and Dr. Holcomb, another consultant to the legal

5   department.  Indeed, this document is closely related to Log 1, Control 115, discussed

6   above, and includes some of the same materials.  Because Lehman and Holcomb were

7   agents of Bard in performing this work, and the result was communicated to Bard

8   attorney Donna Passero, among other Bard personnel, the Court concludes that it is

9   privileged under the Arizona statute:  "any communication is privileged between an

10  attorney for [an] . . . entity . . . and any . . . agent . . . of the entity . . . [f]or the purpose of

11  obtaining information in order to provide legal advice to the entity."  A.R.S. § 12-

12  2234(B)(2).

       The Court also finds this document protected by the work-product doctrine.  Dr.

14  Lehmann was retained by the Bard legal department in anticipation of litigation.

15  Doc. 699.  Plaintiffs argue that the communication also had a business purpose, but a dual

16  purpose document is protected if it "would not have been created in substantially similar

17  form but for the prospect of litigation."  *Richey*, 632 F.3d at 567-68.  The Court cannot

18  conclude that this work would have been done in substantially the same form solely for

19  business reasons.  Nor is the Court persuaded by Plaintiffs' citation to *Phillips*, 290

20  F.R.D. at 652-53.  The cited pages concern an email on a different subject that did not

21  include any legal counsel.  *Id.*

       The Court denies Plaintiffs' motion to compel production of Category 5

23  documents.

       **G.     Category 6.**

       This category involves "[e]ntries describing a communication to non-lawyers and

26  attorneys seeking simultaneous review and comment."  Doc. 1476-3 at 3.   Three of the

27  five examples do not require the Court's attention.  Plaintiffs have withdrawn their

28  challenge to Log 3, Control 809, Bard has produced Log 6, Control 251, and the Court

1    determined above that Log 2, Control 816 is privileged.

2          The redacted portions of Log 3, Control 175 are privileged.  The redacted portions

3    appear in an email from Judith Reinsdorf, one of Bard's in-house lawyers, to several Bard

4    personnel.  Ms. Reinsdorf is providing substantive feedback on a plan to assess clinical

5    issues relating to the G2 filter.  Ms. Reinsdorf's comments appear to be for the purpose of

6    providing legal advice.

7          The redacted portions of Log 3, Control 2099 are privileged.   The redacted

8    portions appear in an email to Gina Dunsmuir, one of Bard's lawyers, and others, and

9    seek comments on draft talking points to Bard's sales force.  Communications with sales

10   force, as noted above, can have significant legal implications, as illustrated by Plaintiffs'

11   claim in this case that Bard's sales force made misrepresentations concerning its

12   products.  Because the communication solicits input from a lawyer on these issues, it falls

13   within A.R.S. § 12-2234(B).

14         The Court denies Plaintiffs' motion to compel production of Category 6

15   documents.

16         **H.      Category 7.**

17         This category involves "[e]ntries that do not describe the author or recipient of the

18   communication, including attachments."  Doc. 1476-3 at 3.   Two of the five examples

19   do not require the Court's attention.  The Court found above that Log 2, Control 403 is

20   privileged, and Bard has produced Log 6, Control 330.

21         Two of the remaining three documents are clearly privileged.  Log 3, Control 224

22   contains legal advice of Bard's in-house and outside counsel.   Log 6, Control 115

23   involves talking points from Bard's in-house counsel with respect to an earnings call that

24   will address ongoing litigation.

25         The final document, Log 3, Control 3089, is privileged.  It involves an email

26   communication among Bard personnel, including both in-house and outside counsel,

27   attaching a draft document.  In Category 1b, above, the Court concluded that the final

28   version of the attachment was privileged.  The draft attachment is addressed to an in-

- 21 -

house Bard lawyer, and others at BPV, and reports on reviews of literature, data bases, and other sources to obtain information regarding risks and complications of particular filters. It also includes a list of known risks. The information contained in the memorandum clearly is of a type that lawyers would consider in advising the company on legal risks, and the Court finds that the memorandum is covered by the attorney-client privilege.

The Court denies Plaintiffs' motion to compel production of Category 7 documents.

## I.     Category 8.

This category involves "[e]ntries where a non-party is an author or listed as receiving a copy of the communication so as to have waived any attorney-client privilege or work product." Doc. 1476-3 at 3. Arizona's corporate attorney-client privilege covers "any employee, agent, or member." A.R.S. § 12-2234(B).

One of these examples does not require the Court's attention. Bard has already produced Log 2, Control 1220. Plaintiffs object that they cannot verify this assertion because Bard has not provided a bates number for the document. Bard is directed promptly to provide Plaintiffs with the bates number of the unredacted version of Log 2, Control 1220 it produced.

The remaining four documents all appear to be privileged. Log 2, Control 502 involves legal communications made by paralegals similar to the examples discussed in Category 1a above. The Court concluded that those and similar communications are privileged. Log 3, Control 335 and Log 3, Control 326 both involve Bard's intellectual property counsel and a draft patent application. Log 2, Control 336 passes along information received from Bard's lawyers for litigation purposes. The attorney-client privilege applies to these documents unless it was waived.

The presence of consultants does not waive the privilege. As already noted, Arizona's corporate privilege covers communications involving a corporation's "agents." A.R.S. § 12-2234(B). What is more, the Court concludes that the Arizona Supreme

1   Court would likely adopt the "functional equivalent" test adopted by the Ninth Circuit,

2   which provides that consultants who act as the functional equivalent of an employee are

3   treated as an employee for purposes of the attorney-client privilege. *See United States v.*

4   *Graf*, 610 F.3d 1148, 1157-59 (9th Cir. 2010). Bard has provided evidence that both

5   Richard Bliss and John Kaufmann functioned as employees. *See* Doc. 1476-9 at 3, ¶¶ 5,

6   7. Under either the plain terms of A.R.S. § 12-2344(B) or the functional equivalent

7   doctrine, the presence of consultants did not result in waiver of an otherwise privileged

8   document.

9          The Court denies Plaintiffs' motion to compel as it pertains to Category 8.

10  **IV.    Remaining Issues.**

11         The Court expects that the parties will use this ruling as a guide to resolve

12  remaining privilege disputes. The parties shall update the Court as to their progress on

13  privilege issues in their joint submission for the next case management conference. In

14  that submission, the parties shall address whether they believe it would be helpful to

15  appoint a special master to resolve any additional privilege disputes.

16         **IT IS ORDERED** that Plaintiffs' motion to compel (Doc. 1214) is **granted in**

17  **part** and **denied in part** as set forth above.

18         Dated this 25th day of July, 2016.

19

20

21

22  _____

23                    David G. Campbell
                 United States District Judge

24

25

26

27

28

- 23 -

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.

***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

**U.S. District Court**

**DISTRICT OF ARIZONA**

**Notice of Electronic Filing**

The following transaction was entered on 2/6/2017 at 3:33 PM MST and filed on 2/6/2017
Case Name:       IN RE: Bard IVC Filters Products Liability Litigation
Case Number:     2:15-md-02641-DGC
Filer:
Document Number: 4865(No document attached)

**Docket Text:**
ORDER. The Court has reviewed the parties' briefing on issues in dispute with respect to Discovery Group 1. Docs. 4503, 4505, 4608, 4639. (In the future, responses and replies shall not be filed when the parties have each stated their positions in the initial filings, as here.) The Court concludes that limitations should not be placed on Plaintiffs' ex parte communications with treating physicians. The Court has reviewed cases cited by both sides, and finds that the weight of recent case law disfavors such limitations. See In re Xarelto (Rivaroxaban) Prods. Liab. Litig., MDL No. 2592, 2016 WL 915288 (E.D. La. Mar. 9, 2016); In re Testosterone Replacement Therapy Prods. Liab. Litig., MDL No. 2545, 2016 WL 929343 (N.D. Ill. Mar. 7, 2016); In re Benicar (Olmesartan) Prods. Liab. Litig., MDL No. 2026, 2016 WL 1370998 (D.N.J. Apr. 6, 2016). Cases imposing such limitations are older than these recent cases and generally lack analysis in support of the limitations they impose. See, e.g., In re Chantix (Varenicline) Prod. Liab. Litig., No. 2:09-CV-2039-IPJ, 2011 WL 9995561 (N.D. Ala. June 30, 2011); In re OrthoEvra Prod. Liab. Litig., No. 1:06-40000, 2010 WL 320064 (N.D. Ohio Jan. 20, 2010); In re Nuvaring Prod. Liab. Litig., No. 4:08MD1964 RWS, 2009 WL 775442 (E.D. Mo. Mar. 20, 2009). The Court finds the more recent decisions persuasive. The Court will adopt the disclosure requirements in the proposed case management order regarding ex parte communications. The Court also notes that it agrees with the Ninth Circuit's position in Goodman v. Staples The Office Superstore, LLC, 644 F.3d 817, 826 (9th Cir. 2011) ("a treating physician is only exempt from Rule 26(a)(2)(B)'s written report requirement to the extent that his opinions were formed during the course of treatment"). The parties have not briefed whether Goodman should apply in this MDL, but, if it does, the parties will not be permitted to present expert opinions that were not formed in the course of treatment unless those opinions were appropriately disclosed under Rule 26(a)(2). On another issue addressed in the briefing, the Court will not require that Defendants question treating physicians first. For treating physicians who would be called by Plaintiffs during their case in chief, "examination and cross-examination of a deponent proceed as they would at trial." Fed. R. Civ. P. 30(c)(1). The Court will adopt Plaintiffs' proposed order language on depositions of treating physicians. Finally, the Court will permit the deposition of one sales representative per case during Discovery Group 1. The Court concludes that such depositions will provide important information for bellwether selection, but that more than one deposition is not needed before selection. The Court will not impose the time or subject limits proposed by Defendants for the sales representative depositions. Signed by Judge David G Campbell on 2-6-17. This is a TEXT ENTRY ONLY. There is no PDF document associated with this entry. (DGC)

**2:15-md-02641-DGC Notice has been electronically mailed to:**

James R Condo     jcondo@swlaw.com, docket@swlaw.com, glass@swlaw.com

Robert B Carey    rob@hbsslaw.com, ecfphx@hbsslaw.com

Robert W Boatman     rwb@gknet.com, Karen.Trumpower@gknet.com, lincoln.combs@gknet.com, matt.boatman@gknet.com

Mark Stephen O'Connor     mark.oconnor@gknet.com, gay.blakesley@gknet.com

Turner Williamson Branch     tbranch@branchlawfirm.com, psanchez@branchlawfirm.com

Joseph Paul Michael Angelo     joe@angelowhitelaw.com, stephen@angelowhitelaw.com

Clyde Talbot Turner     tab@tturner.com, jerrt@tturner.com,tiffany@tturner.com

David A Domina     ddomina@dominalaw.com, efiling@dominalaw.com,kkw@dominalaw.com

Sandy A Liebhard     liebhard@bernlieb.com, jkeller@bernlieb.com, twollek@bernlieb.com

Paul Lincoln Stoller     paul.stoller@gknet.com, deborah.yanazzo@gknet.com

Willard J Moody, Jr     will@moodyrrlaw.com, courtney@moodyrrlaw.com,renee@moodyrrlaw.com

Fred Thompson     fthompson@motleyrice.com

Shannon L Clark     slc@gknet.com, karin.scheehle@gknet.com, roberta.schmidt@gknet.com

Michael William Heaviside     mheaviside@hrzlaw.com, awright@hrzlaw.com

Leonard W Aragon     leonard@hbsslaw.com, amyn@hbsslaw.com, ecfphx@hbsslaw.com

Elizabeth C Helm     kate.helm@nelsonmullins.com

Christopher A Seeger     cseeger@seegerweiss.com

James A Morris, Jr     jmorris@jamlawyers.com, clozano@jamlawyers.com, rflores@jamlawyers.com, sgreenberg@jamlawyers.com

Michael T Gallagher     donnaf@gld-law.com

Eric M Terry     eric@thlawyer.com, kpostol@thlawyer.com,kstephens@thlawyer.com

Michael G Daly     mdaly@pbmattorneys.com

Mark R Niemeyer     niemeyer@ngklawfirm.com

Joe Kendall     jkendall@kendalllawgroup.com, administrator@kendalllawgroup.com, jrudman@kendalllawgroup.com

C Lincoln Combs     lincoln.combs@gknet.com, kelly.saltsman@gknet.com

David J Szerlag     dszerlag@gmail.com, wendy@pritzkerlaw.com

Charles Wade Miller     charles@hop-law.com, jchapman@hop-law.com,kay@hop-law.com

John H Gomez     john@gomeztrialattorneys.com

Annesley H DeGaris     adegaris@degarislaw.com, asapone@degarislaw.com

David R Ongaro     dongaro@ongaropc.com, kmikkelsen@ongaropc.com, nward@ongaropc.com

Anthony J Nemo     tnemo@meshbesher.com

Andrew L Davick     adavick@meshbesher.com

Elaine T Byszewski     Elaine@hbsslaw.com, chads@hbsslaw.com,jconte@hbsslaw.com

Thomas P Cartmell    tcartmell@wcllp.com, m.goldwasser@wcllp.com

Patricia Lynn Campbell    pcampbell@potts-law.com, nchambers@potts-law.com

Amanda Christine Sheridan    asheridan@swlaw.com, docket@swlaw.com, pritchey@swlaw.com

Michael Kevin Brown    mkbrown@reedsmith.com, vbarreto@reedsmith.com

Robert D Rowland    khubbard@ghalaw.com, lisal@ghalaw.com

Yvonne M Flaherty    ymflaherty@locklaw.com, bgilles@locklaw.com, rnzubiate@locklaw.com, sgpatchen@locklaw.com

Wendy R Fleishman    wfleishman@lchb.com, jleitnerzieff@lchb.com, kharding@lchb.com, mdecker@lchb.com

Leslie M Cronen    lcronen@bubalolaw.com, clwebb@bubalolaw.com, stucker@bubalolaw.com

John C Duane    jduane@motleyrice.com, clwhetstone@motleyrice.com, jhill@motleyrice.com, mhopkins@motleyrice.com

Donald A Migliori    dmigliori@motleyrice.com

Kara Trouslot Stubbs    stubbs@bscr-law.com

Samuel J Horovitz    shorovitz@rtlaw.com, drossier@rtlaw.com, sloomis@rtlaw.com

Charles R Houssiere, III    choussi@hdhtex.com, jmbrooks@hdhtex.com, jreznickova@hdhtex.com, rkauffman@hdhtex.com

Ellen A Presby    ellenpresby@nemerofflaw.com, gabrielcanto@nemerofflaw.com, lisadelgado@nemerofflaw.com

Max Freeman (Terminated)    mfreeman@millerweisbrod.com, aboone@millerweisbrod.com, crubin@millerweisbrod.com, mtrull@millerweisbrod.com, tnguyen@millerweisbrod.com

Richard W Schulte    rschulte@yourlegalhelp.com, cartim@yourlegalhelp.com, jgebelle@yourlegalhelp.com

Les Weisbrod (Terminated)    lweisbrod@millerweisbrod.com, btrujillo@millerweisbrod.com

Michael K Johnson    mjohnson@johnsonbecker.com, rfiebiger@johnsonbecker.com, sgray@johnsonbecker.com

Carrie R Capouellez    ccapouellez@lopezmchugh.com

Matthew Ramon Lopez    mlopez@lopezmchugh.com, agarrett@lopezmchugh.com, beast@lopezmchugh.com, mjones@lopezmchugh.com, mwass@lopezmchugh.com

Alexandra V Boone (Terminated)    aboone@millerweisbrod.com, mtrull@millerweisbrod.com

Eric Davis Holland    eholland@allfela.com, tblasa@allfela.com

Joseph A Osborne, Jr    josborne@oa-lawfirm.com, ggiovanni@oa-lawfirm.com, rbell@oa-lawfirm.com

Rolf T Fiebiger    rfiebiger@johnsonbecker.com, sgray@johnsonbecker.com

Gregory N McEwen    gmcewen@mcewenlaw.com, asteinberg@mcewenlaw.com, mschmid@mcewenlaw.com

John J Driscoll    john@thedriscollfirm.com, dawn@thedriscollfirm.com, tiffany@thedriscollfirm.com

Randi Alyson Kassan    rkassan@thesandersfirm.com

Genevieve M Zimmerman    gzimmerman@meshbesher.com, hsternquist@meshbesher.com, mbrylow@meshbesher.com

Jason P Johnston    jjohnston@meshbesher.com, araso@meshbesher.com, gzimmerman@meshbesher.com, hsternquist@meshbesher.com

Joseph Jacob Zonies     jzonies@zonieslaw.com, gbentley@zonieslaw.com, jcox@zonieslaw.com, sshaver@zonieslaw.com

Don K Ledgard     DLedgard@capretz.com, pmartinez@capretz.com

Brendan J Flaherty     brendan@pritzkerlaw.com, tania@pritzkerlaw.com

Kenneth W Pearson     kpearson@johnsonbecker.com, apeterson@johnsonbecker.com

Ahmed Samir Diab     adiab@gomeztrialattorneys.com, nstoneman@gomeztrialattorneys.com

T Matthew Leckman     mleckman@pbmattorneys.com, staylor@pbmattorneys.com

Donald P McKenna, Jr     don@hwnn.com, lynne@hwnn.com

M Blair Clinton     bclinton@hgdlawfirm.com

Stuart Goldenberg     slgoldenberg@goldenberglaw.com, csand@goldenberglaw.com

Marlene J Goldenberg     mjgoldenberg@goldenberglaw.com, csand@goldenberglaw.com

Margaret Moses Branch     mbranch@branchlawfirm.com, psanchez@branchlawfirm.com

Adam Tal Funk     afunk@branchlawfirm.com, ajz@meyers-flowers.com, cdb@meyers-flowers.com, kaz@meyers-flowers.com, kb@meyers-flowers.com, ksmith@branchlawfirm.com, psanchez@branchlawfirm.com

Michael B Leh     mleh@lockslaw.com, ahouchins@lockslaw.com

D Todd Mathews     todd@gorijulianlaw.com, masstortenotices@gorijulianlaw.com

Matthew Robert Boatman     matt.boatman@gknet.com

Michael P McGartland     mike@mcgartland.com, catherine@mcgartland.com, haley@mcgartland.com, stefani@mcgartland.com

David J Hodge     dhodge@mkhlawyers.com, lee@mkhlawyers.com

Angela M Higgins     higgins@bscr-law.com, mcarrillo@bscr-law.com

Tara T Tabatabaie     tara@sill-law.com, ashley@sill-law.com, david@sill-law.com

Mark Kevin Gray     Mgray@grayandwhitelaw.com, cjones@grayandwhitelaw.com

Joseph R Johnson     jjohnson@babbitt-johnson.com, dcodding@babbitt-johnson.com

James Albert Montee     jmontee@monteelawfirm.com, jimmontee@gmail.com

James P Cannon     jpc.atty@yahoo.com

Brandee J Kowalzyk     brandee.kowalzyk@nelsonmullins.com

Matthew B Lerner     matthew.lerner@nelsonmullins.com, carrie.brown@nelsonmullins.com, miche.boles@nelsonmullins.com

Richard B North, Jr     richard.north@nelsonmullins.com, mandy.evangelista@nelsonmullins.com, maria.turner@nelsonmullins.com

Ben C Martin     bmartin@bencmartin.com, cguerra@bencmartin.com, jboyd@bencmartin.com, tarbon@bencmartin.com

Thomas William Arbon     tarbon@bencmartin.com, cguerra@bencmartin.com, jboyd@bencmartin.com

Matthew E Brown     matt.brown@nelsonmullins.com

Taylor Tapley Daly    taylor.daly@nelsonmullins.com

Julia Reed-Zaic    julia@hrzlaw.com, laura@hrzlaw.com, salbers@hrzlaw.com

Laura Elizabeth Smith    laura@hrzlaw.com, awright@hrzlaw.com

Ramon Rossi Lopez    rlopez@lopezmchugh.com, bmeyers@lopezmchugh.com, wespitia@lopezmchugh.com

Troy Alexander Brenes (Terminated)    tbrenes@breneslawgroup.com, jsabol@breneslawgroup.com

Kevin George Lohman    klohman@reedsmith.com, cspoon@reedsmith.com

Nathan Craig Van Der Veer    nate@frplegal.com, hgillis@frplegal.com

Richard Arthur Freese    rich@freeseandgoss.com, regina@freeseandgoss.com

Sheila M Bossier (Terminated)    sbossier@bossier-law.com, kthomas@bossier-law.com

Robert M Hammers, Jr    rob@schneiderhammers.com, abbie@schneiderhammers.com, philip@schneiderhammers.com

James Frederick Rogers    jim.rogers@nelsonmullins.com, julia.norcia@nelsonmullins.com, kim.lanier@nelsonmullins.com

Matthew Ryan McCarley    mccarley@fnlawfirm.com, charlotte@fnlawfirm.com, vcanizales@fnlawfirm.com

Michael S Katz    mkatz@lopezmchugh.com

John A Dalimonte    johndalimonte@kdlaw.net, jessicar@kdlaw.net, rdusablon@kdlaw.net

Teresa C Toriseva    justice@torisevalaw.com

Sanjay Ghosh    sanjay.ghosh@nelsonmullins.com

Clair A Montroy, III    montroylaw@verizon.net

David W Zoll    david@toledolaw.com, amy@toledolaw.com

Melissa Dorman Matthews    mdorman@hdbdlaw.com, alopez@hdbdlaw.com

David B Krangle    dkrangle@alonsokrangle.com

Jason T Schneider    jason@schneiderhammers.com, abbie@schneiderhammers.com, philip@schneiderhammers.com

Calle M Mendenhall    calle@freeseandgoss.com, regina@freeseandgoss.com

Spencer J Pahlke    spahlke@walkuplawoffice.com, lmccombe@walkuplawoffice.com, ssaephan@walkuplawoffice.com

Michael A Kelly    mkelly@walkuplawoffice.com, afreeman@walkuplawoffice.com

Kevin M Hara    Khara@reedsmith.com

Steven James Boranian    sboranian@reedsmith.com, drothschild@reedsmith.com

Daniel C Burke (Terminated)    dburke@bernlieb.com, twollek@bernlieb.com

Kimberly Waters Grant    kgrant@waynegrant.com

Wayne Grant    wgrant@waynegrant.com, jmunn@waynegrant.com

Brandon L Corl    bcorl@potts-law.com, nchambers@potts-law.com

Andres F Alonso    aalonso@alonsokrangle.com

Christopher Thomas Kirchmer    ckirchmer@pulf.com, alee@pulf.com, cguilbeau@pulf.com, dwest@pulf.com

Randal A Kauffman    rkauffman@hdhtex.com, jmanriquez@hdhtex.com

Hadley L Matarazzo    hmatarazzo@faraci.com, tzukoski@faraci.com

Kenneth Riley    kriley@frplegal.com

John Pinckney Harloe, III    john@freeseandgoss.com, Brenda@freeseandgoss.com, calle@freeseandgoss.com, regina@freeseandgoss.com, rich@freeseandgoss.com

Matthew D Davis    mdavis@walkuplawoffice.com, kbenzien@walkuplawoffice.com

Douglas Senger Saeltzer    dsaeltzer@walkuplawoffice.com

Michael Brandon Smith    bsmith@cssfirm.com, gstanton@cssfirm.com, kackerman@cssfirm.com, lwheale@cssfirm.com

Stephen Grant Daniel    buck@howardnations.com, charles@howardnations.com

John Lacoste Langdoc    jlangdoc@baronbudd.com, awilson@baronbudd.com

S Ann Saucer    asaucer@baronbudd.com, awilson@baronbudd.com, glinsenb@baronbudd.com

Laura J Baughman    lbaughman@baronbudd.com, kmoore@baronbudd.com, mhaynie@baronbudd.com

Russell W Budd    rbudd@baronbudd.com, awilson@baronbudd.com, ralaniz@baronbudd.com

Felecia L Stern    stern@bernlieb.com, jkeller@bernlieb.com, twollek@bernlieb.com

Steven D Davis    sdavis@thlawyer.com, kelli@thlawyer.com, rose@thlawyer.com

Jon C Conlin    jconlin@corywatson.com, ivc@corywatson.com, lstovall@corywatson.com

Jeff R Gaddy    JGADDY@LEVINLAW.COM, KMAYO@LEVINLAW.COM, JGILBERT@LEVINLAW.COM

Sindhu Daniel    sdaniel@baronbudd.com, glinsenb@baronbudd.com, yrocha@baronbudd.com

Roland Karim Tellis    rtellis@baronbudd.com, jcampbell@baronbudd.com

Howard L Nations    charles@howardnations.com, alex.dailey@howardnations.com, buck@howardnations.com, shelley@howardnations.com

Rand P Nolen    rand_nolen@fleming-law.com, pam_myers@fleming-law.com

Moze Cowper    mcowper@cowperlaw.com

Daniel Seltz    dseltz@lchb.com

Monte Bond (Terminated)    mbond@tautfestbond.com, acarpenter@tautfestbond.com, kbarron@tautfestbond.com

Brian A Goldstein    brian.goldstein@cellinoandbarnes.com, denise.kinghorn@cellinoandbarnes.com, michael.williams@cellinoandbarnes.com

David P Matthews    dmatthews@dmlawfirm.com, lsantiago@dmlawfirm.com, matthewsivc@thematthewslawfirm.com, msalazar@dmlawfirm.com

H Forest Horne    hfh@m-j.com, sct@m-j.com

Jaclyn L Anderson    janderson@klwtlaw.com

Graham B LippSmith    glippsmith@klwtlaw.com, nsmith@klwtlaw.com

Jennifer Nolte Williams    jwilliams@jacksonallenfirm.com, bwiginton@jacksonallenfirm.com

John H Allen, III    tallen@jacksonallenfirm.com

Glen Elliot Turner    gturner@ongaropc.com, kmikkelsen@ongaropc.com, nward@ongaropc.com

Kirsten McNelly Bibbes    kbibbes@ongaropc.com, dpayne@ongaropc.com, kmikkelsen@ongaropc.com

David Raymond Ongaro    dongaro@ongaropc.com

William B Curtis    bcurtis@curtis-lawgroup.com, jgomez@curtis-lawgroup.com, mburt@curtis-lawgroup.com

Randall Seth Crompton    scrompton@allfela.com, tblasa@allfela.com

Robin P Lourie    rpl@wlr.net

Brian Keith Jackson    kj@rileyjacksonlaw.com, jbailey@rileyjacksonlaw.com, marymalea@rileyjacksonlaw.com

Ethan L Shaw    elshaw@shawcowart.com, scole@shawcowart.com

Matthew J Riley    mriley@shawcowart.com, scole@shawcowart.com

Justin W Fishback    jfishback@shawcowart.com, scole@shawcowart.com

Jeff Seldomridge (Terminated)    jseldomridge@millerfirmllc.com, kunderwood@millerfirmllc.com, tlitzenburg@millerfirmllc.com

Jesse Burl Chrisp    jesse@chrisplaw.com, heather@chrisplaw.com

Melissa Erin Mielke    mmielke@skikos.com, jtucci@skikos.com

David M Langevin    dave@westrikeback.com, kate@westrikeback.com, melanie@westrikeback.com, monal@westrikeback.com

Steven James Skikos    sskikos@skikos.com

Matthew John Skikos    mskikos@skikos.com

Jennifer A Lenze    jlenze@lkmlawfirm.com, torres@lkmlawfirm.com

Jaime E Moss    moss@lkmlawfirm.com, torres@lkmlawfirm.com

Laurie E Kamerrer    kamerrer@lkmlawfirm.com

Nathan Buttars    nate@lowelawgroup.com, jonathan@lowelawgroup.com, kayelani@lowelawgroup.com

Jonathan D Peck    jonathan@lowelawgroup.com

David C DeGreeff    ddegreeff@wcllp.com, dconwell@wcllp.com

Todd E Hilton    hilton@stuevesiegel.com, joyce@stuevesiegel.com, mcclellan@stuevesiegel.com

Sherri L Plotkin    mdweck@rheingoldlaw.com

Matthew David Schultz    mschultz@levinlaw.com, tgilbert@levinlaw.com

Matthew J. McCauley    Mmccauley@yourlawyer.com, NEisner@yourlawyer.com

Philip Sholtz    phil@thedriscollfirm.com

Lucas James Ude    lucas@kelllampinlaw.com, rebecca@kelllampinlaw.com

J Mark Kell    Mark.Kell@KellLampinLaw.com, Rebecca@KellLampinLaw.com

Laura Lynne Voght    LVoght@attorneykennugent.com, KWinkleman@attorneykennugent.com

Rick Barreca    rbarreca@bernripka.com, dcoffey@bernripka.com, edougherty@bernripka.com, mcordner@bernripka.com, mnair@bernripka.com

Stephen Barnett Murray, Jr    smurrayjr@murray-lawfirm.com, aonstott@murray-lawfirm.com, kbeck@murray-lawfirm.com

David Alexander Onstott    aonstott@murray-lawfirm.com

Matthew Paul Skrabanek    paul@psbfirm.com

Nicholas Farnolo    Nfarnolo@napolilaw.com

Jonathan Hogins    jhogins@moodyrrlaw.com, renee@moodyrrlaw.com, will@moodyrrlaw.com

Jacob Edward Levy    jlevy@grayandwhitelaw.com, cjones@grayandwhitelaw.com, mwhite@grayandwhitelaw.com

Matthew Lee White    mwhite@grayandwhitelaw.com

Eric Roslansky    ivc@getjustice.com, eroslansky@getjustice.com, jshahady@getjustice.com

Brian E Tadtman    bet@petersonlawfirm.com

David M Peterson    dmp@petersonlawfirm.com

Nicholas Clevenger    nsc@petersonlawfirm.com, asr@petersonlawfirm.com

Shezad Malik    drmalik@shezadmalik.com, ryan@shezadmalik.com

Kristen K Barton    kbarton@gomeztrialattorneys.com

Mark C Aubuchon    mark.aubuchon@kelllampinlaw.com

William M Berlowitz    Williamb@inebraska.com

William Michael Loughran    michael@angelowhitelaw.com, stephen@angelowhitelaw.com

Christian T Williams    cwilliams@dominalaw.com, efiling@dominalaw.com, kkw@dominalaw.com

Amy J Anderson    sgreenberg@jamlawyers.com, clozano@jamlawyers.com, jmorris@jamlawyers.com, rflores@jamlawyers.com

Everette Scott Verhine    scott@verhine.biz, lisa@verhine.biz

Robert Bruce Warner    BWarner@wvpersonalinjury.com, PWhitlock@wvpersonalinjury.com

Lynnette Simon Marshall    LMarshall@wvpersonalinjury.com, PWhitlock@wvpersonalinjury.com

Kelsey Louise Stokes    kelsey_stokes@fleming-law.com, adrian_martin@fleming-law.com

J Christopher Elliott    celliott@coloradolaw.net, allison.brown@coloradolaw.net, krysta.hand@coloradolaw.net

Jim Mac Perdue, Jr    jperduejr@perdueandkidd.com, bwinegar@perdueandkidd.com, cbatterson@perdueandkidd.com

Donald Hamilton Kidd    dkidd@perdueandkidd.com, cbatterson@perdueandkidd.com

M Michael Waters    mwaters@wjnklaw.com, selliott@wjnklaw.com

Kay L Van Wey    kay@vanweylaw.com, julie@vanweylaw.com, kerri@vanweylaw.com

Joshua D Christian    JChristian@christiananddavis.com, mmaloney@christiananddavis.com

Philip J Pendergrass, Jr    philip@schneiderhammers.com, abbie@schneiderhammers.com

Noah H Kushlefsky    NKUSHLEFSKY@KREINDLER.COM, jferraro@kreindler.com, lranieri@kreindler.com

Matthew Scott Mokwa    mmokwa@maherlawfirm.com, mrayser@maherlawfirm.com

Amorina P Lopez    alopez@lopezmchugh.com, bmeyers@lopezmchugh.com, mwass@lopezmchugh.com

Scott E Brady    scott@bohrerbrady.com, greta@bohrerbrady.com

Philip Bohrer    phil@bohrerbrady.com, shannon@bohrerbrady.com

Thomas Tucker Merrigan    tom@sweeneymerrigan.com, kimberly@sweeneymerrigan.com, tucker@sweeneymerrigan.com

Patrick T Fennell    Pfennell@Crandalllaw.com, Chargenrader@Crandalllaw.com, Rwood@Crandalllaw.com

Richard S Lewis    rlewis@hausfeld.com, adorsey@hausfeld.com, bbeard@hausfeld.com

Steven Rotman    srotman@hausfeld.com

Andrea Layne Stackhouse    layne@shraderlaw.com, jtrigo@shraderlaw.com

Julie S Ferraro    Jferraro@Kreindler.com

Dean A Goetz    dgoetz12@gmail.com

Jason S Morgan    jmorgan@mmlk.com, dwalker@mmlk.com

David J Guarnieri    dguarnieri@mmlk.com, dpritchard@mmlk.com

Michael S. Werner    MWerner@yourlawyer.com, NEisner@yourlawyer.com

Randall John Trost    RJTrost@TrostLaw.com, CBHancock@TrostLaw.com

Randall Troy Trost    RTTrost@TrostLaw.com, CBHancock@TrostLaw.com

Benjamin A Bertram    benbertram@bertramgraf.com, tiffany@bertramgraf.com

Karolina S Kulesza    kkulesza@lawdbd.com

Elizabeth Dudley    liz@lizdudleylaw.com

Nicholas P Scarpelli, Jr    scarpelli@carneylaw.com, durkin@carneylaw.com, kniffin@carneylaw.com

Raymond T Trebisacci    treblaw@comcast.net

Michael Frederick Decker    mdecker@lchb.com, shabonimana@lchb.com

Nathaniel Scearcy    nscearcy@potts-law.com

Edward Blizzard    eblizzard@blizzardlaw.com, bhauer@blizzardlaw.com, mclinton@blizzardlaw.com

Rosemarie Riddell Bogdan    rrbivcbard@1800law1010.com, kawivcbard@1800law1010.com

Braden Beard    bbeard@hausfeld.com

Ashleigh E Raso    araso@meshbesher.com

Joshua Sean Kincannon    jkincannon@lomurrofirm.com, smiller@lomurrofirm.com

Mekel S Alvarez    malvarez@morrisbart.com

Betsy J Barnes    bbarnes@morrisbart.com, bkendrick@morrisbart.com, rroot@morrisbart.com

Karen Delcambre McCarthy    kmccarthy@morrisbart.com

Peter E Goss    pgoss@goss-lawfirm.com, jcampain@goss-lawfirm.com

Timothy David Hedrick    thedrick@rtlaw.com, gtaylor@rtlaw.com

Edward McCarthy, III    emccarthy@rtlaw.com, irodriguez@rtlaw.com

Joe A King, Jr    jking@mkhlawyers.com, tgrant@mkhlawyers.com

Kevin Meade Fitzgerald    kfitzgerald@fitz-lawgroup.com, csumner@fitz-lawgroup.com

Angela Joy Mason    angelamason@cochranfirm.com, amason@cochranfirm.com

Joseph D. Lane    JoeLane@Cochranfirm.com, JLane@Cochranfirm.com

T Aaron Stringer    aaron@lowelawgroup.com

Samuel Mason Wendt    sam@wendtlaw.com, micaela@wendtlaw.com

David L Grebel    grebel@ngklawfirm.com

Michael Stephen Kruse    kruse@ngklawfirm.com, toth@ngklawfirm.com

Peyton P Murphy    Peyton@MurphyLawFirm.com, Jadonna@MurphyLawFirm.com, Kacia@MurphyLawFirm.com

Todd C Comeaux    TC@ComeauxLawFirm.com, Jadonna@MurphyLawFirm.com, Kacia@MurphyLawFirm.com

Henry Shere Queener, III    Hqueener@queenerlaw.com

Amir M Kahana    amk@kahanalaw.com, katherine@kahanalaw.com, samyu@kahanalaw.com, taylor@kahanalaw.com

Bill Bradley, Jr    bbradley@bdjlaw.com, erikam@bdjlaw.com, kgruner@bdjlaw.com

James B Tuttle    jbtesq@nycap.rr.com, barbparker@nycap.rr.com

K Camp Bailey    bailey-svc@bpblaw.com, amcginnis@bpblaw.com, hsantiago@bpblaw.com

Andrew S Groher    agroher@riscassidavis.com, sstokes@riscassidavis.com

Keith L Altman    kaltman@lawampmmt.com, pharma@excololaw.com

Joseph N Williams    jwilliams@rwp-law.com, eamos@rwp-law.com, mllewellyn@rwp-law.com

William F. Blankenship, III    bill@blankenshiplaw.com, jeanette@blankenshiplaw.com

John Reily Crone    john.crone@andruswagstaff.com, jenni.mobley@andruswagstaff.com

Carlyle Glenfield Varlack, Jr    carlylevarlack@hotmail.com

Clint Reed    IVC@johnsonlawgroup.com

Matthew B Moreland    mmoreland@becnellaw.com

Jennifer L Crose    jcrose@becnellaw.com, jcrose@gmail.com

Kevin P Klibert    kklibert@becnellaw.com

Eugene Arthur Arbaugh, Jr    rusty@arbaughlaw.com

Andrew Edward McGraw    amcgraw@levinlaw.com, mgriffin@levinlaw.com, tgilbert@levinlaw.com

Charles T Paglialunga    chuck@phlawfirm.com, amanda@phlawfirm.com, james.humann@phlawfirm.com

Melanie K Schmickle    pharma@swmklaw.com, alyssa@swmklaw.com, melanie@swmklaw.com

Daniel P Barton    dbarton@bartonlawgroup.com, lea@bartonlawgroup.com

Robert R Luke    legal@lukefirm.com, Lindsey@lukefirm.com

Michael J Walsh    mwalsh@walshwoodard.com, cculmone@walshwoodard.com, mmartineau@walshwoodard.com

Roger W Orlando    roger@orlandofirm.com, april@orlandofirm.com, scott@orlandofirm.com

Brian D Weinstein    brian@weinsteincouture.com, service@weinsteincouture.com

Baird Brown    bairdbrownlaw@gmail.com

John Benjamin Black    bblack@sohjlaw.com

John Thomas Kirtley, III    jkirtley@lawyerworks.com, ivcfiling@lawyerworks.com, molvera@lawyerworks.com

Amy Collignon Gunn    agunn@simonlawpc.com, cgibbons@simonlawpc.com

Robert T Naumes, Jr    bnaumes@jeffreysglassman.com, jlamkin@jeffreysglassman.com

John G Simon    jsimon@simonlawpc.com

Andrew W Callahan    acallahan@flintfirm.com, brittany@flintfirm.com, kelly@flintfirm.com, susie@flintfirm.com

Brian Scott Katz    bkatz@flintfirm.com, nichole@brianskatz.com

Michael G Stag    mstag@smithstag.com, ilanier@smithstag.com, nmartin@smithstag.com, tcousans@smithstag.com

Merritt E Cunningham    mcunningham@smithstag.com, ilanier@smithstag.com, tcousans@smithstag.com

Jonathan M Sedgh    jsedgh@weitzlux.com, cpigot@weitzlux.com

Howard A Snyder    howard@howardsnyderlaw.com, hmartindale@gruberlawfirm.com

Daniel S Gruber    dgruber@gruberlawfirm.com, hmartindale@gruberlawfirm.com, rhernandez@gruberlawfirm.com

Anthony A Orlandi    aorlandi@bsjfirm.com, mariahy@bsjfirm.com

Joey P Leniski, Jr    joeyl@bsjfirm.com, mariahy@bsjfirm.com

Brielle Marie Hunt    bhunt@phelanpetty.com, dwood@phelanpetty.com

Michael G Phelan    mphelan@phelanpetty.com, bhunt@phelanpetty.com, dwood@phelanpetty.com

Bonnie Adele Kendrick    bkendrick@morrisbart.com

Thomas A Tarro, III    ttarro3rd@tarromarotti.com

Henry Gilbert Garrard, III      hgg@bbgbalaw.com, lbp@bbgbalaw.com, tdt@bbgbalaw.com

Clifford Alan Rieders      crieders@riederstravis.com, dbueno@riederstravis.com

Basil A Adham      ivc@johnsonlawgroup.com

Mark R Nash      mark.nash@nelsonmullins.com

Josh B Wages      jbw@bbgbalaw.com, cbp@bbgbalaw.com,sws@bbgbalaw.com

James B Matthews, III      jbm@bbgbalaw.com, bb@bbgbalaw.com, btm@bbgbalaw.com

Andrew J Hill, III      ajh@bbgbalaw.com, cbp@bbgbalaw.com, sws@bbgbalaw.com

Patrick H Garrard      phg@bbgbalaw.com, cbp@bbgbalaw.com, sws@bbgbalaw.com

Larry D Helvey      lhelvey@helveylaw.com, helveylaw.legalassistant@gmail.com

Jacob Alex Flint      jflint@flintfirm.com, kelly@flintfirm.com, susie@flintfirm.com

Jennifer A Moore      jmoore@gminjurylaw.com, moost@gminjurylaw.com

Dustin B Herman      dherman@spanglaw.com, ecampbell@ecf.courtdrive.com, sschebek@ecf.courtdrive.com

Stuart E Scott      sscott@spanglaw.com, ecampbell@spanglaw.com, sschebek@spanglaw.com

Andrew F Kirkendall      akirkendall@kirkendalldwyer.com, cdu@kirkendalldwyer.com, rcosta@kirkendalldwyer.com

Alexander G Dwyer      adwyer@kirkendalldwyer.com, msclafani@kirkendalldwyer.com

Emily Ward Roark      emily@bryant.law, christina@bryant.law

Mark Edward Berns      berns@onderlaw.com, schoemehl@onderlaw.com

Gregory J Pals      greg@thedriscollfirm.com

Courtland Carter Chillingworth      cchillingworth@reedsmith.com

Barry JD Levy      bdl@oal-law.com, axf@oal-law.com, cas@oal-law.com

Debra J Humphrey      dhumphrey@bernllp.com, dcoffey@bernllp.com, edougherty@bernllp.com, kwan@bernllp.com, mcordner@bernllp.com

Philip M Busman      phil.busman@nelsonmullins.com, tracy.stanforth@nelsonmullins.com

Dennis Andrew Hom      dennis.hom@nelsonmullins.com

Andrew Joseph Rosenzweig      andrew.rosenzweig@nelsonmullins.com

Douglass Alan Kreis      dkreis@awkolaw.com, athane@awkolaw.com, croberts@awkolaw.com

Michael A Bottar      mab@bottarleone.com, smb@bottarleone.com, sriggi@bottarleone.com

Louis Francis Gilligan      lgilligan@kmklaw.com, mtrue@kmklaw.com

Roxell Ann Richards      rr@roxellrichards.com, Roxellrichards@gmail.com

Oluwaseun Adetoun Adeyemi      masstorts@roxellrichards.com

Mason Lee Boling      mboling@arkattorneys.com, kitty@arkattorneys.com

Sean T Keith    skeith@arkattorneys.com, kitty@arkattorneys.com

Joseph J Cappelli    jcappelli@bernllp.com, dcoffey@bernllp.com, dhumphrey@bernllp.com

Kevin J Boissoneault    kboisson@gallonlaw.com, mwiltshire@gallonlaw.com

Michael D Bell    mbell@gallonlaw.com, mwiltshire@gallonlaw.com

Jonathan M Ashton    jashton@gallonlaw.com, mwiltshire@gallonlaw.com

Michael C Schafle    MSchafle@greenlegalteam.com

Peter M Merrigan    peter@sweeneymerrigan.com

Jonathan Tucker Merrigan    tucker@sweeneymerrigan.com

**2:15-md-02641-DGC Notice will be sent by other means to those listed below if they are affected by this filing:**

Aaron A Clark
McGrath North Law Firm
First National Tower
1601 Dodge St., Ste. 3700
Omaha, NE 68102-1627

Alex Cameron Walker
Modrall Sperling Roehl Harris & Sisk PA
500 4th St. NW, Ste. 1000
Albuquerque, NM 87102

Amanda Montee
Montee Law Firm
P.O. Box 127
St. Joseph, MO 64502

Andrew J Trevelise
Reed Smith LLP - Philadelphia, PA
1717 Arch St., Ste. 3100
Philadelphia, PA 19103-7301

Anthony James Urban
Urban Law
P.O. Box 890
Pottsville, PA 17901

Bobby Saadian
Wilshire Law Firm PLC
3055 Wilshire Blvd., 12th Fl.
Los Angeles, CA 90010

Brian Broussard Winegar
Perdue & Kidd
510 Bering Dr., Ste. 550
Houston, TX 77057

Brian John Perkins
Meyers & Flowers LLC
3 N 2nd St., Ste. 300
St Charles, IL 60174

Bruce S Kingsdorf
Barrios Kingsdorf & Casteix LLP
1 Shell Sq.
701 Poydras St., Ste. 3650
New Orleans, LA 70139-3650

Catherine A Faught Pollard
Quarles & Brady LLP - Milwaukee, WI
411 E Wisconsin Ave., Ste. 2040
Milwaukee, WI 53202-4497

Chris Johnson

Christopher Brian Watt
Reed Smith LLP - Houston, TX
811 Main St., Ste. 1700
Houston, TX 77002

Christopher J Quinn
Driscoll Firm PC
211 N Broadway, Ste. 4050
St Louis, MO 63102

Craig D Henderson
Snapka Law Firm
P.O. Box 23017
Corpus Christi, TX 78403

Craig E Hilborn
Hilborn & Hilborn
999 Haynes, Ste. 205
Birmingham, MI 48009

Daniel K Winters
Reed Smith LLP - New York, NY
599 Lexington Ave., 30th Fl.
New York, NY 10022-7650

David J Cooner
McCarter & English LLP - Newark, NJ
4 Gateway Ctr.
100 Mulberry St.
Newark, NJ 07101

David J Walz
Carlton Fields Jorden Burt PA - Tampa, FL
P.O. Box 3239
Tampa, FL 33601-3239

David W Ledyard
Strong Pipkin Bissell & Ledyard - Beamont, TX
595 Orleans, Ste. 1400
Beaumont, TX 77701

Dawn M Barrios
Barrios Kingsdorf & Casteix LLP
1 Shell Sq.
701 Poydras St., Ste. 3650
New Orleans, LA 70139-3650

Debra A Djupman
Reed Smith LLP - Philadelphia, PA
1717 Arch St., Ste. 3100
Philadelphia, PA 19103-7301

Dennis P Mulvihill
Wright & Schulte - Cleveland, OH
23240 Chagrin Blvd.
Cleveland, OH 44122

Diana Rabeh
Reed Smith LLP - Wilmington, DE
1201 Market St., Ste. 1500
Wilmington, DE 19801

E Terry Sibbernsen
Sibbernsen, Strigenz Law Firm - Omaha
1111 N 102nd Ct., Ste. 330
Omaha, NE 68114

Edna M Gray

Edward W Gerecke
Carlton Fields Jorden Burt PA - Tampa, FL
P.O. Box 3239
Tampa, FL 33601-3239

Elaine Sargeant

Elizabeth G Grimes
Law Offices of Michael A DeMayo LLP
P.O. Box 34426
Charlotte, NC 28234

Elizabeth Hosea Lemoine
Wick Phillips Gould & Martin LLP
3131 McKinney Ave., Ste. 100
Dallas, TX 75204

Elizabeth S Fenton
Chamberlain Hrdlicka
300 Conshohocken State Rd., Ste. 570
W Conshohocken, PA 19428

Ellen Relkin
Weitz & Luxenberg PC - New York, NY
700 Broadway, 5th Fl.
New York, NY 10003

Eric J Buhr
Reed Smith LLP - Los Angeles, CA
355 S Grand Ave., Ste. 2900
Los Angeles, CA 90071

Frederick R Hovde
Hovde Dassow & Deets LLC
Meridian Twr.

201 W 103rd St., Ste. 500
Indianapolis, IN 46290

Gary Robert Tulp
McCarter & English LLP - Newark, NJ
4 Gateway Ctr.
100 Mulberry St.
Newark, NJ 07101

Gary F Hamilton


Gerard C Kramer
Schmidt Ronca & Kramer PC
209 State St.
Harrisburg, PA 17101

Gerard M Parks


Gregory D Bentley
Zonies Law LLC
1900 Wazee St., Ste.203
Denver, CO 80202

Hilary E Youngblood
Davidovitz & Bennett
101 Montgomery St., Ste. 2550
San Francisco, CA 94104

Jack Edward Urquhart
Snapka Law Firm
P.O. Box 23017
Corpus Christi, TX 78403

Jacob W Plattenberger
Torhoerman Law LLC
234 S Wabash Ave., 7th Fl.
Chicago, IL 60604

James P Catalano
Nelson Mullins Riley & Scarborough LLP - Nashville, TN
1 Nashville Pl.
150 4th Ave. N, Ste. 1100
Nashville, TN 37219

Jamie Jean McKey
Kendall Law Group LLP
3232 McKinney Ave., Ste. 700
Dallas, TX 75204

Jane T Davis
Nelson Mullins Riley & Scarborough LLP - Charleston, SC
151 Meeting St., Ste. 600
Charleston, SC 29401

Janet Lynn White


Jennifer Ann Guidea

Reed Smith LLP - New York, NY
599 Lexington Ave., 30th Fl.
New York, NY 10022-7650

Jennifer J Hageman
Ulmer & Berne LLP - Cincinnati, OH
600 Vine St., Ste. 2800
Cincinnati, OH 45202

Joan Anderson


Jody Lynn Rudman
Kendall Law Group LLP
3232 McKinney Ave., Ste. 700
Dallas, TX 75204

John A Camp
Carlton Fields Jorden Burt - Miami, FL
100 SE 2nd St., Ste. 4200
Miami, FL 33131

John G Mitchell
Secrest Wardle
P.O. Box 5025
Troy, MI 48007-5025

John J Glenn
Anderson Glenn LLC
2201 NW Corporate Blvd., Ste. 100
Boca Raton, FL 33431

John Neumann Hickey
Law Offices of John N Hickey
20 W Front St.
Media, PA 19063

Jordan L Chaikin
Parker Waichman LLP - Bonita Springs, FL
27300 Riverview Center Blvd., Ste. 103
Bonita Springs, FL 34134

Joshua A Mankoff
Lopez McHugh LLP - Philadelphia, PA
1123 Admiral Peary Way, Quarters K
Philadelphia, PA 19112

Joshua D Miller
Toriseva Law
1446 National Rd.
Wheeling, WV 26003

Joshua R Johnson
Babbitt & Johnson PA
1641 Worthington Rd., Ste. 100
W Palm Beach, FL 33402

Joshua S Whitley
Smyth Whitley
BB&T Plz.

234 Seven Farms Dr., Ste. 234
Charleston, SC 29492

Justin Ross Kaufman
Heard Robins Cloud LLP - Santa Fe, NM
505 Cerrillos Rd., Ste. A209
Santa Fe, NM 87501

Katherine Diven

Kathryn Snapka
Snapka Law Firm
P.O. Box 23017
Corpus Christi, TX 78403

Kelly Elswick-Hall
Masters Law Firm
181 Summers St.
Charleston, WV 25301

Kevin R Martin
Martin Law Offices SC
7280 S 13th St., Ste. 102
Oak Creek, WI 53154

Lawrence R Murphy , Jr
Richards & Connor
525 S Main St., 12th Fl.
Tulsa, OK 74103

Louisa O Kirakosian
Waters Kraus & Paul
222 N Sepulveda Blvd., Ste. 1900
El Segundo, CA 90245

Louise Greene

Lynne Bonner

Mariann M Robison
Richards & Connor
525 S Main St., 12th Fl.
Tulsa, OK 74103

Mark A Sentenac
Reed Smith LLP - San Francisco, CA 2nd St.
101 2nd St., 18th Fl.
San Francisco, CA 94105

Mathew R Doebler
Pribanic & Pribanic LLC
513 Court Pl.
Pittsburgh, PA 15219

Melanie M Atha
Cabaniss Johnston Gardner Dumas & ONeal LLP
P.O. Box 830612

Birmingham, AL 35283-0612

Michael Ockerman
Hanna Campbell & Powell
3737 Embassy Pkwy., Ste. 100
Akron, OH 44333

Michael F Marlow
Johnson Miner Marlow Woodward & Huff PLLC
P.O. Box 667
Yankton, SD 57078-0667

Michael Joseph Ryan
Lopez McHugh LLP - Philadelphia, PA
1123 Admiral Peary Way, Quarters K
Philadelphia, PA 19112

Michael L Armitage
Waters Kraus & Paul
222 N Sepulveda Blvd., Ste. 1900
El Segundo, CA 90245

Michael Alan Gross

Nancy June Falls

Neilli M Walsh
Young Conaway Stargatt & Taylor LLP
Rodney Sq.
1000 N King St.
Wilmington, DE 19801

Neville H Boschert
Jones WalkerWaechter Poitevent Carrere & Denegre
P.O. Box 427
Jackson, MS 39205-0427

Nevin Christopher Brownfield
Ongaro PC
50 California St., Ste. 3325
San Francisco, CA 94108

Patrick T Clendenen
Nelson Mullins Riley & Scarborough LLP - Boston, MA
1 Post Office Sq.
Boston, MA 02109

Peter C Wetherall
Wetherall Group Limited
9345 W Sunset Rd., Ste. 100
Las Vegas, NV 89148

Peter J Brodhead
Spangenberg Shibley & Liber LLP
1001 Lakeside Ave. E, Ste. 1700
Cleveland, OH 44114

Peter Thomas Anderson

Ashcraft & Gerel LLP – Alexandria, VA
4900 Seminar Rd., Ste. 650
Alexandria, VA 22311

Raymond G Mullady , Jr
Nelson Mullins Riley & Scarborough LLP – Washington, DC
101 Constitution Ave. NW, Ste. 900
Washington, DC 20001

Raymond Joseph Kramer , III
Torhoerman Law LLC
234 S Wabash Ave., 7th Fl.
Chicago, IL 60604

Rhett A McSweeney
McSweeney Langevin LLC
2116 2nd Ave. S
Minneapolis, MN 55404

Richard A Zappa
Young Conaway Stargatt & Taylor LLP
Rodney Sq.
1000 N King St.
Wilmington, DE 19801

Richard Allen Cohn
Aitken Aitken Cohn
P.O. Box 2555
Santa Ana, CA 92707

Richard E Vollertsen
Atkinson Conway & Gagnon Incorporated
420 L St., Ste. 500
Anchorage, AK 99501

Richard J Schicker
Schicker Law Firm
2809 S 160th St., Ste. 207
Omaha, NE 68130

Ricky L Boren
Hill Boren
P.O. Box 3539
Jackson, TN 38303-0539

Robert Diemer
Davidovitz & Bennett
101 Montgomery St., Ste. 2550
San Francisco, CA 94104

Robert R Hatten
Patten Wornom Hatten Diamonstein LC
12350 Jefferson Ave., Ste. 300
Newport News, VA 23602

Robert Williams Goldwater , III
Goldwater Law Firm PC
15849 N 71st St., Ste. 100
Scottsdale, AZ 85254

Roberts Clay Milling , Jr.
Henry Spiegel Milling LLP
950 E Paces Ferry Rd., Ste. 2450
Atlanta, GA 30326

Ruth A Horvatich
McGrath North Law Firm
First National Tower
1601 Dodge St., Ste. 3700
Omaha, NE 68102-1627

Sarah Mangum(Terminated)

Shelia Sloan

Tayjes Matthew Shah
Miller Law Firm LLC
108 Railroad Ave.
Orange, VA 22960

Thomas Melone
Allco Renewable Energy Limited
14 Wall St., 20th Fl
New York, NY 10005

Thomas A Kenefick , III
Law Office of Thomas A Kenefick III
73 Chestnut St.
Springfield, MA 01103

Thomas K Herren
Herren & Adams
148 N Broadway
Lexington, KY 40507

Tiffany L Roach Martin
MNodrall Sperling Roehl Harris & Sisk PA - Santa Fe, NM
P.O. Box 2168
Santa FE, NM 87103-2168

Timothy Pinegar

Timothy E Lengkeek
Young Conaway Stargatt & Taylor LLP
Rodney Sq.
1000 N King St.
Wilmington, DE 19801

Timothy John Freiberg
Freiberg Law Offices
4545 Springbrook Rd.
Rockford, IL 61114

Tor A Hoerman
TorHoerman Law LLC - Edwardsville, IL
101 W Vandalla St., Ste. 350
Edwardsville, IL 62025

Vickie J Traughber

Vivian M Quinn
Nixon Peabody LLP - Buffalo NY
Key Towers at Fountain Plaza
40 Fountain Plz., Ste. 500
Buffalo, NY 14202

W Bryan Smith
Morgan & Morgan PA - Memphis, TN
2600 One Commerce Sq.
Memphis, TN 38103

William H Carpenter
William H Carpenter Law Office Limited
P.O. Box 35070
Albuquerque, NM 87176-5070

William S Curtiss
Earthjustice Legal Defense Fund
180 Montgomery St
Ste 1725
San Francisco, CA 94104-4209

Wilnar Jeanne Julmiste
Anderson Glenn LLC
2201 NW Corporate Blvd., Ste. 100
Boca Raton, FL 33431

Zachary Logan Wool
Barrios Kingsdorf & Casteix LLP
1 Shell Sq.
701 Poydras St., Ste. 3650
New Orleans, LA 70139-3650

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE: Bard IVC Filters Products Liability Litigation, | No. MDL 15-02641-PHX DGC<br><br>**CASE MANAGEMENT ORDER NO. 26** |

The Court held a tenth case management conference on July 13, 2017. The conference addressed ongoing matters identified in the parties' joint report. Doc. 6599. The following matters are decided.

## A.   Dr. Henry Deposition.

In order to decide whether Dr. Henry should be re-deposed, the Court must decide whether the objections asserted in his first deposition were appropriate. On or before **July 28, 2017**, the parties shall file memoranda, not to exceed 12 pages, addressing the following issues: (1) Does Federal Rule of Evidence 501 apply to the privilege asserted by Dr. Henry's counsel? (2) If so, what state law supplies the rule of decision within the meaning of Rule 501? (3) Does the applicable state law support the objection and instruction made by Dr. Henry's attorney? (4) Even if the instruction and objection were appropriate in the normal case, does assertion of the learned intermediary defense mean that the objection and instruction should not be permitted?

**B.     Proposed Deposition of Dr. Altonaga.**

Case Management Order No. 24 addressed fact depositions in bellwether cases: "These depositions may include Bard present or former employees only if the depositions will likely produce probative evidence that could not reasonably have been obtained during general discovery." Doc. 5883 at 1-2. After considering the parties' arguments, the Court concludes that the evidence Plaintiffs now seek to elicit from Dr. Altonaga could reasonably have been obtained during general discovery. Plaintiffs do not seek facts unique to any of the bellwether cases, but instead to obtain Bard information that existed at the time of the design, sale, and use of the various filters at issue in the bellwether cases. While bellwether cases had not been identified during general discovery, Plaintiffs clearly understood that most of the cases in this MDL concern the G2-series or Eclipse filters, and could have deposed Dr. Altonaga during general discovery regarding facts related to those filters and the years in which they were offered for sale. As a result, the requirement of CMO 24 is not satisfied and the Court will not permit Plaintiffs to depose Dr. Altonaga as part of bellwether-case discovery.

**C.     Communications Among Plaintiffs' Experts.**

The Court and parties held a discussion regarding the discoverability of communications between Plaintiffs' experts, with the Court attempting to provide some guidance on its interpretation of Rule 26(b)(4). Plaintiffs shall produce communications among their experts to Defendants. If Plaintiffs conclude that any such communications are properly withheld, they shall provide Defendants with a privilege log that identifies the specific basis on which Plaintiffs' conclude that the communications are protected under Rule 26(b). If the parties have disagreements after this production has occurred, they should place a conference call to the Court for a resolution.

**D.     Preemption Motion Briefing.**

The Court sets the following schedule for completion of briefing on Defendants' preemption motion for summary judgment:

- Plaintiffs' experts on preemption shall be disclosed by **July 21, 2017**;
- Defense experts on preemption, if sought by Defendants and allowed by the Court after a conference call, shall be disclosed by **August 4, 2017**;
- Preemption experts shall be deposed by **August 18, 2017**;
- Plaintiffs' response to Defendants' motion shall be filed by **September 1, 2017**;
- Defendants' reply shall be filed by **September 22, 2017**.

Defendants' motion to seal exhibits will be briefed on the following schedule:

- Defendants' amended motion to seal shall be filed on or before **July 28, 2017**;
- Plaintiffs' response shall be filed on or before **August 28, 2017**;
- Defendants' reply shall be filed on or before **September 13, 2017**.

### E.     Class Certification Hearing.

The Court will allow 45 minutes per side for oral argument at the class certification hearing on **August 11, 2017**.  The Court does not expect this to be an evidentiary hearing.

### F.     Next Case Management Conference and Science Day.

The next case management conference will be held on **October 5, 2017, at 10:00 a.m.**  The parties shall file a joint report seven days before the conference.

A science day will also be held on **October 5, 2017.**  The Court will set aside two hours per side for science presentations.

### G.     Motions to Disqualify Experts.

Plaintiffs shall respond to the recently filed motion to disqualify Drs. Vogelzang and Desai by **July 28, 2017**.  Defendants shall file a reply by **August 4, 2017**.  The Court will endeavor to review this motion before the class certification hearing on August 11, 2017.

### H.     Bellwether Trial Issues.

The Court and the parties discussed preparation for and scheduling of bellwether trials.  The Court advised the parties that it cannot know whether bellwether trials will be possible in the first quarter of 2018 until it sees the volume and substance of the *Daubert* motions and motions for summary judgment to be filed in late August.  The Court and parties will address the scheduling of bellwether trials on October 5, 2017.

The Court advised the parties that it may be very difficult for the Court to conduct all six bellwether trials within a 12 or 18 month period, given the Court's docket and administrative responsibilities.  The Court raised the possibility of enlisting other judges to try some of the bellwether cases.  If such an approach were taken, the trials probably could be scheduled over the course of a year or 18 months, dates could be blocked out, and the other judges could be identified.  The parties should address this issue in the joint report to be filed before the conference on October 5, 2017.

The Court advised the parties of its practices regarding a final pretrial conference and motions in limine.  The Court also stated that it would be willing to entertain the possibility of juror questionnaires.

### I.     Other Matters.

The Court and parties discussed choice of law issues that might arise in the bellwether cases.  The Court asked the parties to discuss this issue and see if they can agree on a method for briefing.  It may be that such briefing needs to occur as part of the summary judgment briefing, particularly since a choice of law will not be necessary unless the law of the possible jurisdictions is in conflict on specific points raised in the summary judgment briefing.  If the parties need the Court's guidance on this matter before summary judgment briefs are filed, they may place a telephone call to the Court.

The Court will also require the parties to discuss bellwether summary judgment motions before they are filed on August 21, 2017.  The purpose of such discussion will be to identify claims that Plaintiffs intend to assert in each of the bellwether cases and arguments Defendants intend to make with respect to such claims.  The parties should

1　　endeavor to focus and streamline the briefing wherever possible.  If issues are to be

2　　addressed that apply to some or all of the bellwether cases, they should be briefed only

3　　once.  The parties should also endeavor to make the statements of fact as efficient as

4　　possible.

5　　　　　　Dated this 14th day of July, 2017.

6

7

8

9　　　　　　　　　　　　　　　　　　　　　　　　David G. Campbell
　　　　　　　　　　　　　　　　　　　　　　　United States District Judge
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 5 -

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

IN RE:  Bard IVC Filters Products Liability Litigation,

No. MDL 15-02641-PHX DGC

**CASE MANAGEMENT ORDER NO. 27**

---

The Court held an eleventh case management conference on October 5, 2017.  The conference addressed ongoing matters identified in the parties' joint report.  Doc. 7854.

### A.     Privilege Issues.

Defendants asked the Court to require Plaintiffs to include in their privilege log any communications withheld from production that occurred between experts, even if they included a lawyer.  After discussion, the Court declined to require a privilege log.  Instead, Plaintiffs shall provide the Court all such communications that they have withheld, for *in camera* review.  The Court will randomly select ten communications and review them for privilege.   Plaintiffs shall provide these documents on or before **October 13, 2017**.

Defendants also expressed concern about the method used for collecting email communications among Plaintiffs' experts at Northwestern University.   The Court directed Plaintiffs' counsel to communicate with these experts, particularly in light of one email that was provided by Defendants at the hearing, to ensure that all communications have been produced.  Plaintiffs shall do so no later than **October 13, 2017**.

**B.     Motion Hearings.**

The Court will hold motion hearings on **November 17, 2017 at 1:00 p.m.**, **December 15, 2017 at 1:00 p.m.**, and **January 19, 2018 at 1:00 p.m.**  These hearings will concern pending *Daubert* motions, motions to disqualify experts, and motions for summary judgment.  The motion for summary judgment on preemption will be heard on **November 17, 2017 at 1:00 p.m.**  The parties shall meet and confer regarding the motions to be heard on these dates and shall submit their joint proposal to the Court by **October 13, 2017.**

**C.     Scheduling of Bellwether Trials.**

The Booker bellwether trial will be held on **March 13-16, 20-23, and 27-30, 2018**.  The Jones bellwether trial will be held on **May 15-18, 22-25, and 29-30, and June 1, 2018.**  The Court will schedule other bellwether trials, and will set dates for final pretrial conference in Booker and Jones, at coming status conferences.

**D.     Science Day.**

The Court held a "science day" on October 5, 2017.  The parties agreed at the beginning of the discussion that it need not be on the record.  Each side presented relevant information in support of their position on various science issues in the case. Each side also presented some information supporting their liability arguments in the case.  The Court listened for the purpose of understanding issues it will need to address in upcoming motions hearings.  The Court formed no view on the question of liability or the merits of any motion as a result of the hearing, and returned all exhibits to the parties at the end of the discussion.

**E.     Plaintiffs' Motion for Partial Summary Judgment.**

Plaintiffs have filed a for summary judgment motion in the Jones case.  Doc. 7363. Defendants stated at the conference that they have no opposition to the granting of the motion.  The Jones Plaintiffs' motion for partial summary judgment on Defendants' thirteenth affirmative defense (Doc. 7363) is therefore **granted.**

**F.      Additional Matter.**

The Court informed the parties of a matter it was exploring to ensure that recusal was not necessary.  The Court has completed that inquiry and concludes that recusal is not necessary.

**G.      Next Status Conference.**

The Court will hold a status conference after the motions arguments on November 17, 2017 at 1:00 p.m.  The parties shall file a joint status report on or before **November 14, 2017.**

Dated this 10th day of October, 2017.

_____
David G. Campbell
United States District Judge

- 3 -

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| IN RE:  Bard IVC Filters Products Liability Litigation, | No. MDL 15-02641-PHX DGC<br><br>**ORDER** |

At the tenth case management conference on July 13, 2017, the Court and parties discussed the discoverability of communications between Plaintiffs' experts, with the Court attempting to provide some guidance on its interpretation of Rule 26(b)(4). *See* Doc. 6765.  The Court thereafter directed Plaintiffs to produce to Defendants all discoverable communications among their experts and to provide a privilege log that identifies the specific basis on which Plaintiffs conclude that any communications are protected under Rule 26(b).  Doc. 6799 at 2.

In their recent status report, the parties raised a dispute regarding Plaintiffs' production of the expert communications and privilege log.   Doc. 7854 at 11-17. Plaintiffs state that they have produced all communications between attorneys and experts excepted from Rule 26(b)(4)'s protection and, with one exception, have produced every communication between experts even if attorneys were copied on the communications.  *Id.* at 12.  Defendants take the position that every communication from an expert either needs to be produced or listed on a privilege log.  *Id.* at 13-14.

The dispute was addressed at the eleventh case management conference on October 5, 2017.  *See* Doc. 8144.  The Court declined to require a privilege log but, with the parties' consent, directed Plaintiffs to submit the expert communications withheld for *in camera* review of ten randomly selected communications.  Doc. 8113 at 1.  Plaintiffs provided the communications to the Court on October 13, 2017.  *See* Doc. 8182.

The Court has completed its review and finds that the communications are protected by Rule 26(b)(4) and were properly withheld.  *See Izzo v. Wal-Mart Stores, Inc.*, No. 2:15-cv-01142-JAD-NJK, 2016 WL 593532, at *4 (D. Nev. Feb. 11, 2016) (finding that the withholding party met its burden of showing that expert-attorney communications did not fall within one of the exceptions to Rule 26(b)(4)(C)).

**IT IS ORDERED** that Plaintiffs need not produce the withheld expert communications or provide a privilege log on these communications to Defendants.

Dated this 20th day of October, 2017.

David G. Campbell
United States District Judge

- 2 -